# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

J&G SALES LTD,
                    *Plaintiff-Appellee,*

v.

CARL J. TRUSCOTT, Director,
Bureau of Alcohol, Tobacco,
Firearms and Explosives,
                    *Defendant-Appellant.*

No. 04-16976

D.C. No.
CV-03-02263-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

Argued and Submitted
October 20, 2006—San Francisco, California

Filed January 16, 2007

Before: Sandra Day O'Connor, Associate Justice (Ret.),*
and Pamela Ann Rymer, and Sidney R. Thomas, Circuit
Judges.

Opinion by Retired Justice O'Connor

---

*The Honorable Sandra Day O'Connor, Associate Justice of the United
States Supreme Court (Ret.) sitting by designation pursuant to 28 U.S.C.
§ 294(a).

## COUNSEL

Peter D. Keisler, Assistant Attorney General, Paul K. Charlton, United States Attorney, Michael S. Raab and Lewis S. Yellin (argued), Civil Division, United States Department of Justice; Joel J. Roessner, Deputy Associate Chief, Peter W. Mickelson and Rebekah Holman, Office of the Chief, Bureau of Alcohol, Tobacco, Firearms & Explosives, Washington, D.C., for the appellant.

Richard E. Gardiner, Fairfax, Virginia, for the appellee.

## OPINION

O'CONNOR, Associate Justice (Ret.):

The Bureau of Alcohol, Tobacco, Firearms, and Explosives appeals from the district court's grant of summary judgment

holding that the Bureau lacks authority to issue a letter requiring a small percentage of licensed firearms dealers to submit portions of their records relating to secondhand firearms. Because we find that the Bureau acted within its statutory authority under 18 U.S.C. § 923(g)(5)(A), we reverse the district court's grant of summary judgment. We affirm, however, the district court's determination that the Bureau did not act in an arbitrary and capricious fashion in deciding which dealers should receive the disputed letter.

I.

The Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, requires persons wishing to "engage in the business of importing, manufacturing, or dealing in firearms" to apply for and obtain a license from the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[1] 18 U.S.C. § 923(a). Successful applicants, known as federal firearms licensees ("FFLs"), must create and maintain detailed records documenting the firearms transactions that they conduct. When FFL dealers receive a firearm they must record "the date of receipt, the name and address or the name and license number of the person from whom received, the name of the manufacturer and importer (if any), the model, serial number, type, and the caliber or gauge." 27 C.F.R. § 478.125(e). After selling a firearm, FFL dealers must further record the name and address of the purchaser along with the date of sale. *See id.*

---

[1]Although the Gun Control Act initially granted firearms licensing authority to the Secretary of the Treasury, the Secretary delegated this authority to what was then called the Bureau of Alcohol, Tobacco, and Firearms. When Congress passed the Homeland Security Act of 2002, it transferred the licensing authority from the Treasury Department to the Department of Justice, which subsequently delegated the authority to the reconfigured Bureau of Alcohol, Tobacco, Firearms, and Explosives. 28 C.F.R. § 0.130(a)(1). Because any distinction between the two Bureaus is irrelevant to the disposition of this case, we will use the term "the Bureau" to refer broadly to the entity that has assumed responsibility for licensing the firearms industry. *See Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 283 n.3 (4th Cir. 2004).

Rather than submitting all of their transaction records to the Bureau, FFLs keep their records on their own premises. This arrangement exists at least in part because the Firearm Owners' Protection Act of 1986 ("FOPA"), *see* 18 U.S.C. § 926(a), and a rider that has been attached to every Bureau appropriations bill since 1978, *see, e.g.*, Appropriations, 2000 —Treasury, Postal Service, Executive Office of the President, and General Government, 114 Stat. 2763, 2763A-129 (2000), forbid the Bureau from establishing a national firearms registry. Despite this ban on creating a centralized registration system, Congress has authorized the Bureau to maintain at least two sets of transaction records. First, FFLs must submit a report to the Bureau when they sell an unlicensed person two or more of certain firearms within a span of five consecutive business days ("multiple sales"). *See* 18 U.S.C. § 923(g)(3)(A). Second, FFLs that go out of business must submit their records to the Bureau within thirty days. *See* 18 U.S.C. § 923(g)(4). In addition, the Bureau is authorized to access FFL records in some instances. *See, e.g.*, 18 U.S.C. § 923(g)(1)(B)(iii) (permitting the Bureau to examine FFL records without reasonable cause or obtaining a warrant when doing so "may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation").

The Bureau relies upon FFL records when it seeks to trace a firearm at the behest of a law enforcement officer. "A crime gun trace begins when a law enforcement official recovers a firearm, usually from a crime scene or from the possession of a suspect, felon or other prohibited person, and the law enforcement agency having jurisdiction of the case submits a trace request to [the Bureau's] National Tracing Center (NTC)." *See* Bureau of Alcohol, Tobacco, and Firearms, Department of the Treasury, *Commerce in Firearms in the United States* 19 (2000) ("*Commerce in Firearms*"). Using the distinguishing characteristics of the firearm, including its serial number, the NTC begins by searching the records of out-of-business FFLs and by searching multiple sales records.

*See id.* at 20. "If these steps do not identify the first retail transaction, the NTC contacts the manufacturer or importer, and tracks the recovered crime gun through the distribution chain (wholesaler and retailer) to the retail dealer, requesting the dealer to examine his records to determine the identity of the first retail purchaser." *Id.*

This tracing system works adequately when the initial retail purchaser of a firearm retains possession of the firearm. If that first purchaser should sell or otherwise transfer the firearm, however, it is "generally impossible" to conduct a trace because "[f]ederal law does not require unlicensed sellers to preserve transfer records." *Id.* at 26. In order to trace a secondhand firearm, authorities must resort to an "investigative trace," which requires time-consuming interviews and the use of informants. *See id.* Because investigative traces are resource intensive and seldom succeed, the Bureau infrequently undertakes such measures in order to trace a secondhand firearm. *See id.* Consequently, while FFLs must maintain records documenting their secondhand firearm transactions, *see* 27 C.F.R. § 478.125(e), the standard trace fails to uncover this information because there is no link between the first transaction and subsequent transactions. *See Commerce in Firearms* at 26. This gap in the tracing system is important because a large percentage of the firearms sold annually are secondhand firearms.

On February 4, 2000, the Bureau published a comprehensive report that analyzed some of the data regarding trace requests on firearms. *See Commerce in Firearms* (2000). The report noted that in 1998 a small percentage of FFL dealers accounted for the majority of firearms for which traces were conducted. *See id.* at 23.[2] The report further noted that,

---

[2]*Commerce in Firearms* at 23, Table 13, Distribution of Traces among Current Dealers, 1998 (indicating that while just 1.2% of all FFL dealers had ten or more guns traced to them, those dealers accounted for 57.4% of all gun traces).

although the average amount of time between when a firearm is initially sold and when a gun is recovered at a crime scene or when a trace is requested ("time-to-crime") is six years, many traces on firearms occurred within three years of sale or less. *See id.* at 25. "Time-to-crime of three years or less is considered an important trafficking indicator because it suggests that the firearm was rapidly diverted to the illegal market." *Id.* at 21 n.33.

In order to combat the difficulties of tracing secondhand firearms, the Bureau decided to send demand letters seeking a limited amount of information to the approximately 450 FFL dealers who in 1999 had been linked to ten or more trace requests with a time-to-crime of three years or less. The demand letters obligated members of this select group, who comprised just 0.6% of FFL dealers, to provide the following information regarding secondhand gun acquisitions: the name of the manufacturer and/or importer; the acquisition date; the model; the caliber or gauge; and the serial number. Recipients of the demand letters were expressly directed not to provide either the name of the person from whom the secondhand firearm was acquired or to whom the firearm was transferred.

On August 4, 2003, the Bureau sent J&G Sales, Ltd. ("J&G") such a demand letter because tracing records indicated that 15 or more firearms with a time-to-crime of three years or less had been traced to J&G, an FFL dealer. Letter from the Bureau to J&G at 1 (Aug. 4, 2003). The demand letter explained the difficulties of tracing secondhand guns and suggested the fact that J&G "had a high number of traces of new crime guns with a short 'time-to-crime' may mean that [J&G is] also selling a commensurate number of secondhand guns used in crime." *Id.* The demand letter further instructed J&G to submit its report for 2002 secondhand firearms acquisitions to the NTC within thirty days, and quarterly reports thereafter until it was informed otherwise. *See id.* at 2-3.

On November 18, 2003, J&G opted against releasing the information requested in the demand letter and instead filed

a complaint seeking declaratory judgment and injunctive relief against the Bureau. *See J & G Sales, Ltd. v. Domenech*, No. CV 03-2263-PCT-PGR, Order at 3 (D. Ariz., Aug. 5, 2004). With respect to its request for declaratory judgment, J&G asserted that the demand letter exceeded the Bureau's statutory authority, constituted an arbitrary and capricious agency action, and violated due process of law. *See id.* With respect to its request for injunctive relief, J&G sought to prohibit the Bureau from penalizing it for its refusal to comply with the demand letter and to require that the Bureau destroy any records that J&G had already submitted. *See id.* On January 26, 2004, in response to J&G's complaint, the Bureau filed a document it styled a "Motion to Dismiss or for Summary Judgment," which the district court construed as a Motion for Summary Judgment. *See id.* at 4.

The district court found that the demand letter represented an unlawful request for J&G's records because it fell beyond the scope of the Bureau's statutory authority. *See id.* at 29. Accordingly, the district court enjoined the Bureau from seeking to enforce the letter that it issued to J&G. Despite determining that the Bureau lacked authority to issue the demand letter, the district court granted summary judgment to the Bureau on all other grounds, including that the Bureau's method for targeting particular firearms dealers to receive demand letters was not arbitrary and capricious. *See id.* This appeal followed.

II.

We apply a de novo standard of review to both a district court's grant of summary judgment and questions of statutory interpretation. *See Arizona State Bd. for Charter Schools v. United States Dep't of Educ.*, 464 F.3d 1003, 1006 (9th Cir. 2006). "When reviewing an agency's construction of a statute it is charged with administering, we look first to the statutory text to see whether Congress has spoken directly to the question at hand." *Contract Mgmt., Inc. v. Rumsfeld*, 434 F.3d

1145, 1146 (9th Cir. 2006). If that statutory text clearly reveals Congress's intent, we stop our inquiry there because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

## A.

**[1]** Although this case presents a question of first impression in this circuit, this is not the first time that a federal court of appeals has assessed whether the Bureau possesses statutory authority to send demand letters to FFLs requiring them to provide specified record information. The Court of Appeals for the Fourth Circuit has twice considered — and twice upheld — the Bureau's authority to issue such letters under 18 U.S.C. § 923(g)(5)(A).

In *RSM, Inc. v. Buckles*, 254 F.3d 61 (4th Cir. 2001), the Fourth Circuit considered whether the Bureau could, in response to another problem identified in the *Commerce in Firearms* report, issue demand letters to FFLs who failed to comply adequately with the Bureau's firearms trace requests. *See id.* at 63. These uncooperative FFLs received demand letters because they: "(1) failed to respond to a firearms trace request on at least one occasion; (2) failed to respond to a trace request within 24 hours on three or more occasions; or (3) provided incorrect information in response to a request." *See id.* Noting that just 41 FFLs (less than 0.1% of the 80,000 FFLs in the nation) had been deemed uncooperative, the Fourth Circuit determined that, while the Bureau's statutory authority to issue demand letters is not boundless, "[n]othing in the relevant statutory framework suggests . . . that letters which are narrowly-tailored to facilitate [the Bureau's] trace-request authority in criminal investigations run afoul of [the Bureau's] authority under section 923(g)(5)(A) to issue appropriate requests for record information." *Id.* at 63, 67.

**[2]** In *Blaustein & Reich v. Buckles*, moreover, the Fourth Circuit considered an FFL dealer's challenge to a demand letter requesting information regarding its acquisitions of secondhand firearms, a demand letter seeking substantially the same information as the one at issue here. *See* 365 F.3d 281, 283 (4th Cir. 2004). Bob's Gun Shop, the FFL dealer that contested the Bureau's statutory authority in *Blaustein & Reich*, raised almost precisely the same objections to the Bureau's authority as J&G does in the instant matter. The Fourth Circuit rejected each of the arguments disputing the Bureau's authority to issue the demand letter asserted by Bob's Gun Shop. *See id.* at 287-90. Today, we agree with the Fourth Circuit that § 923(g)(5)(A) authorizes the Bureau to issue such demand letters.

### B.

**[3]** The Bureau grounds its statutory authority to issue the type of demand letter that it sent to J&G Sales in 18 U.S.C. § 923(g)(5)(A). Congress passed that provision when it amended the Gun Control Act with FOPA, part of which — both parties agree — permitted the Bureau to send demand letters to FFL dealers requiring them to submit record information, at least in certain instances. Section 923(g)(5)(A), the demand letter amendment, provides:

> Each licensee shall, when required by letter issued by the [Bureau], and until notified to the contrary in writing by the [Bureau], submit on a form specified by the [Bureau], for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the [Bureau] in such letter may specify.

18 U.S.C. § 923(g)(5)(A).[3] Read in isolation, there can be no

---

[3]This amendment "essentially codified" 27 C.F.R. § 178.126(a), a 1968 regulation requiring FFLs to submit record information when the Bureau

question that § 923(g)(5)(A) authorizes the Bureau to issue the disputed demand letter.

J&G challenges the Bureau's plain reading of § 923(g)(5)(A) by insisting that this demand letter provision must be read within § 923's broader statutory context. To that end, J&G marshals other statutory provisions that, it contends, effectively demonstrate that the Bureau has exceeded the scope of its statutory authority by sending J&G the demand letter at issue. We turn now to these statutory arguments.

**[4]** First, J&G contends that the Bureau's understanding of § 923(g)(5)(A) cannot be reconciled with § 923(g)(1)(A), which indicates that FFLs "shall not be required to submit to the [Bureau] reports and information with respect to such records and the contents thereof, except as expressly required by this section." 18 U.S.C. § 923(g)(1)(A). It is certainly true that § 923(g)(1)(A) limits the Bureau's ability to procure information from FFLs to the express requirements of § 923, but it does not eviscerate the content of § 923(g)(5)(A). As the Fourth Circuit noted in *Blaustein & Reich*, "Section 923(g)(5)(A) contains a condition precedent. It requires an FFL to submit record information to the Bureau but only if the Bureau issues a demand letter requesting it. This condition precedent does not negate the fact that § 923(g)(5)(A) contains an *express requirement* that is provided for in § 923(g)(1)(A)." 365 F.3d at 287 n.14.

**[5]** After analyzing data indicating that a small number of FFL dealers accounted for a majority of firearms that were

seeks it. *RSM*, 254 F.3d at 64. 27 C.F.R. § 478.126(a), which is the current incarnation of 27 C.F.R. § 178.126(a), states in relevant part: "Each licensee shall, when required by letter issued by the Director of Industry Operations, and until notified to the contrary in writing by such officer, submit . . . all record information required by this subpart, or such lesser record information as the Director of Industry Operations in his letter may specify." *Id.* Apart from some minor changes in nomenclature, this regulation has remained substantially unchanged since 1968. *See RSM*, 254 F.3d at 64 n.1.

traced, the Bureau set out to remedy its inability to trace secondhand firearms by using a narrowly-tailored approach. Accordingly, the Bureau sent the demand letter at issue to a small fraction of FFLs and sought only a limited subset of information from FFLs regarding a limited subset of firearms. Whatever the boundaries of the Bureau's authority, the demand letter at issue falls safely within them. In this case, "[i]t is unnecessary . . . to delineate the precise scope of [the Bureau's] authority to issue letters to FFLs." *RSM*, 254 F.3d at 67. While Congress has long sought to prohibit the Bureau from establishing a national firearms registry, the Bureau's actions here do not come close to realizing this forbidden goal. Rather, the demand letter at issue seeks a limited amount of information from FFL dealers in order to help remedy the problem posed by tracing secondhand firearms. "While we are not free to ascribe to section 923(g)(5)(A) an open-ended reach, neither are we at liberty to eliminate altogether its positive grant of authority." *Id.*

Second, explicating which provisions it contends are accounted for in § 923(g)(1)(A), J&G asserts that according § 923(g)(5)(A) the reading that the Bureau urges would serve to nullify two other provisions of the Gun Control Act. These two provisions, J&G contends, make it apparent that the Bureau may request record information from FFLs only in the course of bona fide criminal investigations: (1) a subsection which authorizes the Bureau to "inspect or examine the inventory and records of a[n FFL] without . . . reasonable cause or warrant" in particular circumstances, 18 U.S.C. § 923(g)(1)(B);[4]

---

[4]Section 923(g)(1)(B) provides that the Bureau may inspect FFL records in the following instances without having probable cause or needing to obtain a warrant:

    (i) in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee; (ii) for ensuring compliance with the record keeping requirements of this chapter—(I) not more than once during any 12-month period; or (II) at any time with respect to records relat-

and (2) a subsection that requires FFLs to respond to requests from the Bureau within 24 hours, when the Bureau seeks information regarding a firearm in the course of a criminal investigation, 18 U.S.C. § 923(g)(7).[5] Congress would not have made these specific allowances, J&G asserts, if the Bureau could simply make an end-run around these requirements by issuing demand letters regarding this information pursuant to § 923(g)(5)(A).

[6] Each of these provisions, however, serves quite distinct purposes from the demand letter. Section 923(g)(1)(B) governs when Bureau officials may physically gain entry onto an FFL's premises in order to inspect record information. When the Bureau merely sends a demand letter requesting certain limited information, no physical intrusion whatsoever occurs. This is a difference that matters. *See RSM*, 254 F.3d at 66 ("The statutory scheme makes clear that section 923(g)(1)(B) is aimed at preventing warrantless, on-site searches of FFLs' records. In contrast, issuance of a letter under section 923(g)(5)(A) does not involve the entry of [Bureau] agents onto an FFL's premises."). Similarly, § 923(g)(7) imposes speedy reporting requirements on FFLs in the context of criminal investigations, and neither explicitly nor implicitly serves to limit the Bureau's power under § 923(g)(5)(A). *See Blaustein & Reich*, 365 F.3d at 287 n.13 ("[Section] 923(g)(7) does not limit the Bureau's authority to issue demand issue letters like the one issued to Bob's Gun Shop."); *see also*

---

ing to a firearm involved in a criminal investigation that is traced to the licensee; or (iii) when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

18 U.S.C. § 923(g)(1)(B).

[5]Section 923(g)(7) provides in relevant part: "Each [FFL] shall respond immediately to, and in no event later than 24 hours after the receipt of, a request . . . for information contained in the records . . . as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation." 18 U.S.C. § 923(g)(7).

*RSM*, 254 F.3d at 66 ("Section 923(g)(7) does not purport either to address or restrict [the Bureau's] section 923(g)(5)(A) authority to issue letters. Instead, it establishes the duties of FFLs when they receive a trace request."). Rather than the Bureau attempting to transform these afore-mentioned provisions into nullities, it is J&G who seeks to strip § 923(g)(5)(A) of its independent meaning.

**[7]** Finally, J&G advances an argument involving two statutory provisions that Bob's Gun Shop does not appear to have advanced in *Blaustein & Reich*. If § 923(g)(5) is accorded the reading that the Bureau urges, J&G contends that §§ 923(g)(3)(A) and (g)(4) would be rendered superfluous. Section 923(g)(3)(A) requires FFLs to submit a report to the Bureau when it sells an unlicensed person two or more of certain firearms within a span of five consecutive business days. Section 923(g)(4) requires firearms businesses that go out of business to submit their records to the Bureau within thirty days.

**[8]** Simply because some provisions of § 923 impose specific duties upon FFLs to respond to certain requests within a specified time frame and to provide record information sua sponte does not mean that the Bureau is prohibited from seeking further FFL record information by demand letter. Nothing in the statute suggests that the Bureau's authority extends only to the statutory provisions that J&G agrees to recognize. And we decline J&G's invitation to so limit that authority.

Because we find that — even after considering § 923(g)(5)(A) in its broader context — the statute is clear, we need not address J&G's exhaustive discussion of 18 U.S.C. § 923's legislative history. *See Ratzlaf v. United States,* 510 U.S. 135, 147-148 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

## C.

**[9]** Turning beyond the confines of § 923, J&G also contends that the Bureau's issuance of the demand letter here

conflicts with Congress's prohibition on new rules or regulations regarding FFL records articulated in 18 U.S.C. § 926(a). That provision provides in relevant part:

> No such rule or regulation prescribed after the date of the enactment of [FOPA, May 19, 1986,] may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States . . . , nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.

18 U.S.C. § 926(a). Because the Bureau had not previously issued demand letters to FFLs in precisely this fashion, J&G asserts, its action "is, in effect, a new regulation." Appellee's Br. at 33.

**[10]** By the very terms of the statute, however, § 926(a) cannot be understood to limit the Bureau's authority to issue demand letters under either § 923(g)(5)(A) or 27 C.F.R. § 478.126(a). *See Blaustein & Reich*, 365 F.3d at 288. Section 926(a) has no bearing on § 923(g)(5)(A) because the former provision pertains only to "rule[s]" and "regulation[s]" and the latter is a statute, not a rule or regulation. *See id.*; *see also id.* at 290 ("Section 926(a) prohibits a federal agency from prescribing new *rules or regulations* that require FFLs to report their records."). Moreover, § 926(a) has no bearing on 27 C.F.R. § 478.126(a) because it prohibits the promulgation of rules and regulations prescribed only after May 19, 1986, and the regulation at issue dates back to 1968. *See id.* at 288. Although before 2000 the Bureau had never previously issued demand letters precisely like the one at issue here, that does not mean that the agency lacked regulatory authority to issue J&G the contested letter. Nor was the demand letter a new "rule or regulation" simply because it represented a departure from the Bureau's prior interpretation of its authority, as J&G

suggests. *See Chief Probation Officers of California v. Sha-lala*, 118 F.3d 1327, 1334 (9th Cir. 1997). Thus, § 926(a)'s provision barring new rules and regulations is plainly inapposite to the discussion at hand.

## III.

Aware that this court could reverse the district court's statutory holding, J&G also urges affirmance on the ground that the Bureau's issuance of a demand letter in these particular circumstances constitutes arbitrary and capricious agency action, in violation of 5 U.S.C. § 706(A)(2). In essence, J&G contends that the demand letter at issue is a shot in the dark. We disagree.

When reviewing an agency action to determine whether it is arbitrary and capricious, our scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In this court, the review of whether an agency's action "was arbitrary or capricious is highly deferential, presuming the agency action to be valid." *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002) (internal quotation marks omitted). The agency must, of course, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). While we may not remedy deficient agency actions, courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (internal quotation marks and citations omitted). Moreover, "[w]here the agency's line-drawing does not appear irrational and the [party challenging the agency action] has not shown that the consequences of the line-drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's discretion." *Leather Indust. of Am. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994).

**[11]** J&G proposes four distinct theories contending that the Bureau's issuance of the contested demand letter constitutes arbitrary and capricious agency action. First, J&G contends that the demand letter asserted, without any basis in fact, that "crime guns" seized from "crime scenes" had been traced to it. The crux of this contention is that the Bureau sometimes conducts traces on guns that were not in fact used in crimes. Because the records submitted by the Bureau to the district court under seal were heavily redacted, J&G suggests, the district court could not determine whether the sixteen firearms traced to J&G were actually "crime guns." But J&G's effort to dispute whether the sixteen firearms in question were in fact "crime guns" falters because that is a term of art, which the Bureau invokes to refer to any gun that is the subject of a trace request. The Bureau traces firearms at the behest of law enforcement officials, and it seems safe to assume that law enforcement officials do not generally opt to have traces conducted out of idle curiosity. Even if that assumption is proven incorrect, however, we cannot fault the agency simply for seeking a limited subset of information from FFLs that were connected to a large number of traced guns. Although the Bureau might have selected a broader term than "crime gun" to describe firearms that had been traced by law enforcement officials, mere linguistic imprecision does not render an agency's action arbitrary and capricious.

**[12]** Second, J&G claims that the Bureau's threshold of firearm traces for determining which FFL dealers would receive the demand letter should have taken into account overall sales volume. Under this theory, FFL dealers that sell a large number of firearms may receive a demand letter even if a comparatively small percentage of its firearms ended up having a trace conducted. While the Bureau certainly could have considered what percentage of firearms sold ended up being traced in order to establish a threshold for issuing the demand letter, the Bureau's decision to rely instead on an absolute number of traces does not render the action arbitrary

and capricious. The agency need not craft the perfect threshold in order to survive review, but merely demonstrate that its threshold stems from reasoned decisionmaking. This, the agency has done.

[13] Third, J&G contends that the Bureau acted impermissibly when it increased the triggering threshold of firearms traces from ten to fifteen in 2002. As a preliminary matter, it is unclear why J&G seeks to challenge the increased threshold because, with its sixteen traced guns with a time-to-crime of three years or less, J&G would have received a letter under either threshold. Moreover, as the Bureau notes, the data that the agency relied upon from the *Commerce in Firearms* report to establish the ten-trace threshold also supported the fifteen-trace threshold. *See Commerce in Firearms* at 23, Table 13, Distribution of Traces among Current Dealers, 1998. J&G has not demonstrated why fifteen traced firearms established an irrational threshold, and we can find no reason to upset the agency's decision.

[14] Fourth, J&G asserts that the Bureau incorrectly thought that it could extrapolate from data regarding traces conducted on new firearms to traces conducted on secondhand firearms. But as the Fourth Circuit observed in *Blaustein & Reich*: "[T]he Bureau reasonably deduced that since [a] small group of dealers was the original source of a disproportionate share of the new firearms that were traced, this same group might also be the source — through illegal or legal means — of a substantial percentage of secondhand firearms that are traced." 365 F.3d at 291. We can think of no reason, and J&G has not offered one, to believe that an FFL dealer who sells a large number of new firearms that end up being traced would not similarly sell a large number of used firearms that also end up being traced.[6]

---

[6]The demand letter did provide an exemption from reporting for FFL dealers who do not sell secondhand firearms. *See* Letter from the Bureau to J&G at 4.

**[15]** Thus, we agree with the district court that the Bureau's issuance of the demand letter to J&G in these particular circumstances did not constitute arbitrary and capricious agency action.

## IV.

For the foregoing reasons, we reverse the district court's grant of summary judgment and hold that the Bureau possessed statutory authority to issue J&G the letter demanding the specified record information regarding its secondhand firearms transactions. We affirm the district court's determination that the Bureau's issuance of a demand letter to J&G in these circumstances did not constitute arbitrary and capricious agency action.

AFFIRMED IN PART AND REVERSED IN PART.