**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELLEN LEVINE; BEVERLY ULBRICH;
KRISTA KIELMAN; GRETCHEN
WALLERICH; KANDA BOYKIN;
HUMANE SOCIETY OF THE UNITED
STATES; EAST BAY ANIMAL
ADVOCATES; WESTERN NORTH
CAROLINA WORKERS' RIGHTS
CENTER; MISSISSIPPI POULTRY
WORKERS FOR EQUALITY AND
RESPECT,
          *Plaintiffs-Appellants,*

                v.

THOMAS J. VILSACK,*
          *Defendant-Appellee.*

No. 08-16441

D.C. No.
CV 05-04764-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn Hall Patel, District Judge, Presiding

Argued and Submitted
October 7, 2009—San Francisco, California

Filed November 20, 2009

Before: Alfred T. Goodwin and Pamela Ann Rymer,
Circuit Judges, and George H. Wu,** District Judge.

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), the current United States Secretary of Agriculture Thomas J. Vilsack is substituted in as Defendant-Appellee.

**The Honorable George H. Wu, United States District Judge for the Central District of California, sitting by designation.

Opinion by Judge Wu

## COUNSEL

Sarah Uhlemann, Jonathan R. Lovvorn and Carter Dillard, The Humane Society of the United States, Washington, D.C.; and Corey Evans and Geneva Page, Evans & Page, San Francisco, California, for the appellants.

Gregory G. Katsas, Jonathan F. Cohn, Michael S. Raab and Henry C. Whitaker, Civil Division, U.S. Department of Justice, Washington, D.C., for the appellee.

## OPINION

WU, District Judge:

Dr. Ellen Levine, Beverly Ulbrich, Krista Kielman, Gretchen Wallerich, Kanda Boykin, The Humane Society of the United States, East Bay Animal Advocates, Mississippi Poultry Workers for Equality and Respect, Western North

Carolina Workers' Center, John Doe I, and John Doe II (henceforth collectively "Levine") appeal from a summary judgment ruling in favor of the Secretary of the United States Department of Agriculture ("Secretary" or "USDA"). This case involves a dispute concerning whether chickens, turkeys and other domestic fowl are excluded from the humane slaughter provisions of what the parties (and references subsequent to the enactment) term the "Humane Methods of Slaughter Act of 1958" ("HMSA of 1958").[1] *See* 7 U.S.C. §§ 1901-07. In particular, the parties dispute whether poultry should be considered "other livestock" as that phrase is used in that statute. *Id.* at § 1902(a). Levine challenged USDA's enunciation of its position — made most recently on September 28, 2005, in a Federal Register Notice issued by USDA's Food Safety and Inspection Service, *see Treatment of Live Poultry before Slaughter*, 70 Fed. Reg. 56,624 (Sept. 28, 2005) — that "there is no specific federal humane handling and slaughter statute for poultry." *Id.* at 56,625.

In *Levine v. Conner*, 540 F. Supp. 2d 1113 (N.D. Cal. 2008), the United States District Court for the Northern District of California ("district court") determined that, while the plain meaning of the word "livestock" as used in the HMSA of 1958 is ambiguous, Congressional intent behind the term was clear and consistent with the interpretation adopted by the USDA. Because we conclude that Levine cannot satisfy the redressability prong of Article III standing, we vacate that decision and remand to the district court so that it can dismiss the action.

---

[1]As discussed below, in 1978, Congress enacted pertinent legislation also termed the "Humane Methods of Slaughter Act." *See* Pub. L. No. 95-445, 92 Stat. 1069 (1978). Levine brought the present litigation pursuant to the HMSA of 1958 and not the 1978 legislation.

## I. BACKGROUND

### A. *Statutory Background*

In 1958, Congress passed the HMSA of 1958. *See* Pub. L. No. 85-765, 72 Stat. 862 (1958) (codified as amended at 7 U.S.C. §§ 1901-07). That legislation mandated (and continues to mandate) that "the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." 7 U.S.C. § 1901. It also authorized and directed the Secretary to designate "humane" methods of slaughter conforming "to the policy stated in this chapter" for "each species of livestock." *Id.* at § 1904(b).

When enacted, section 1902 set forth "two methods of slaughtering and handling" as humane:

> (a) in the case of cattle, calves, horses, mules, sheep, swine, *and other livestock*, all animals are rendered insensible to pain by a single blow or gunshot or an electrical, chemical or other means that is rapid and effective, before being shackled, hoisted, thrown, cast, or cut; or

> (b) by slaughtering in accordance with the ritual requirements of the Jewish faith or any other religious faith that prescribes a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument.[2]

*Id.* § 1902 (emphasis added). Congress provided an enforcement provision, but only in the form of generally prohibiting

---

[2] A 1978 amendment added "and handling in connection with such slaughtering" at the close of this sentence. *See* Pub. L. No. 95-445, 92 Stat. 1069 (1978).

the federal government from purchasing livestock products where the animals were slaughtered by methods other than those designated and approved by the Secretary. *See* Pub. L. No. 85-765, 72 Stat. 862, 862-63 (codified at 7 U.S.C. § 1903 (repealed 1978)).[3] The following year, USDA prescribed humane slaughter methods for those species expressly identified in the statute in addition to goats.[4] *See* 24 Fed. Reg. 1549, 1551-53 (Mar. 3, 1959) (to be codified at 9 C.F.R. pt. 180).

The HMSA of 1958 did not define the terms "livestock" or "other livestock." Congressional debate revealed views favoring both interpretations advanced here — one that would include chickens, turkeys and other domestic fowl within its expanse and one that would preclude such inclusiveness. *See*, *e.g.*, 104 Cong. Rec. 1655, 1659 (1958). Numerous versions of the legislation were advanced, some specifically including the term "poultry" and some (including the one eventually adopted) which excluded use of that specific term. *See, e.g.*, 104 Cong. Rec. 15,368 (1958); H.R. 3029, 85th Cong., Sec. (g)(2) (1957); H.R. 8308, 85th Cong. § 2 (1957). One provision (now repealed) of the HMSA of 1958 itself separately referred to "livestock growers" and the "poultry industry" in

---

[3]7 U.S.C. § 1903 had stated in relevant part:

 The public policy declared in this chapter shall be taken into consideration by all agencies of the Federal Government in connection with all procurement and price support programs and operations and after June 30, 1960, no agency or instrumentality of the United States shall contract for or procure any livestock products produced or processed by any slaughterer or processor which in any of its plants or in any plants of any slaughterer or processor with which it is affiliated slaughters or handles in connection with slaughter livestock by any methods other than methods designated and approved by the Secretary of Agriculture . . . .

[4]The HMSA of 1958 also included a provision for identifying carcasses inspected under the Meat Inspection Act (discussed further in the text below as the "Federal Meat Inspection Act"), which also covered goats, that had been slaughtered in accordance with the public policy of the HMSA of 1958. *See* Pub. L. No. 85-765, 72 Stat. 862, 863 (codified at 7 U.S.C. § 1904(c) (repealed 1978)).

connection with the formation of an advisory committee designed to consult with the Secretary and USDA officials in the course of carrying out the mandates set forth elsewhere in the legislation. *See* Pub. L. No. 85-765, 72 Stat. 862, 863 (codified at 7 U.S.C. § 1905 (repealed 1978)). In addition, in the prior year, the same Congress had passed the Poultry Products Inspection Act ("PPIA") (21 U.S.C. §§ 451-72) which, among other things, gave USDA authority to inspect poultry producers for compliance with health and sanitary requirements, required inspection of poultry after slaughter, established labeling requirements for poultry products, and allowed for withdrawal of inspections for noncompliance and the imposition of civil and criminal penalties for the sale of adulterated products. *See* 21 U.S.C. §§ 455-57, 461.

In 1978, in legislation also termed a "Humane Methods of Slaughter Act" ("HMSA of 1978"), Congress repealed (along with certain other sections) the only enforcement provision contained within the HMSA of 1958 (*i.e.*, the prohibition on federal government purchases of inhumanely slaughtered livestock products previously found in 7 U.S.C. § 1903), and, at the same time, incorporated humane slaughter provisions into the Federal Meat Inspection Act ("FMIA") (21 U.S.C. §§ 601-95), which had originally been enacted in 1907. *See* Pub. L. No. 95-445, 92 Stat. 1069 (1978). Unlike the HMSA of 1958, however, the FMIA imposed inspection requirements only for "cattle, sheep, swine, goats, horses, mules, and other equines." *Id.* § 2, 92 Stat. at 1069; *see also* 21 U.S.C. § 603(a). As a result, if, upon inspection of the slaughtering of those animals, the slaughtering practices were not in accord with those established pursuant to the promulgated regulations, the USDA could suspend mandatory inspection (in effect cutting off those slaughterhouses from the commercial marketplace and the consuming public), and could impose criminal penalties. *See* 21 U.S.C. §§ 603(b), 604, 676. USDA then issued regulations implementing the 1978 amendments, which replaced the pre-existing regulations issued pursuant to the HMSA of 1958 and covered only those animals listed in

the FMIA. *See* 44 Fed. Reg. 37,954 (June 29, 1979). Never-theless, in enacting the HMSA of 1978, Congress did not repeal those provisions of the HMSA of 1958 — 7 U.S.C. §§ 1902(a), 1904(b) — which 1) set forth the specific list of species for purposes of that earlier statute, 2) included the terms "other livestock" and "livestock," and 3) authorized and directed the Secretary to designate compliant methods of slaughter.

In 2005, Congress deleted the specific list of animals from the FMIA and replaced it with the term "amenable species." *See* Agriculture, Rural Development, Food and Drug Admin-istration, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-97, Title VII, § 798, 119 Stat. 2120 (2005). "Amenable species" was defined to include "those species subject to the provisions of this chapter on the day before November 10, 2005" as well as "any additional species of livestock that the Secretary considers appropriate." 21 U.S.C. § 601(w).[5]

## B.   *History Of USDA's Position*

In the same month that Congress passed the HMSA of 1958, USDA itself gave some indication that it considered "[c]hicken eggs, commercial broilers, chickens, and turkeys" as "[l]ivestock and livestock products." *See Changes in Farm Production and Efficiency*, USDA Statistical Bulletin No. 233, at 4-5 & n.5 (Aug. 1958). In 1960, however, regulations were issued which defined "livestock products" for purposes of the HMSA of 1958 to mean any article intended for or capable of being used as food for either human or animals which is derived from slaughtered "cattle, calves, horses, mules, sheep, swine, or goats," and specifying further that the

---

[5]In 2008, section 601(w) was again amended to specifically include cat-fish within the definition of "amenable species." *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, Title XI, § 11016(b)(1)(A)(ii), (iii), 122 Stat. 923, 1369 (2008).

term "do[es] not include . . . poultry." 25 Fed. Reg. 11152, 11152 (Nov. 23, 1960). USDA reiterated that position in 1979 in response to inquiries as to whether any humane slaughtering requirements covered chickens following the 1978 amendments.[6] *See* 44 Fed. Reg. 68,809, 68,811 (Nov. 30, 1979). On September 28, 2005, USDA's Food Safety and Inspection Service issued a Federal Register Notice ("the Notice") entitled "Treatment of Live Poultry Before Slaughter." 70 Fed. Reg. 56,624 (Sept. 28, 2005). The Notice indicated that it was in response to "considerable congressional and public interest in the humane treatment of animals, including poultry." *Id.* In the Notice, the USDA announced that "[t]he HMSA of 1978 . . . requires that humane methods be used for handling and slaughtering livestock but does not include comparable provisions concerning the handling and slaughter of poultry." *Id.* at 56,624-25 (citation omitted). While it "remind[ed] all poultry slaughter establishments" that live poultry must be handled "in a manner that is consistent with good commercial practices, which means they should be treated humanely" and that compliance with the PPIA incidentally promoted humane slaughter, it also indicated that "there is no specific federal humane handling and slaughter statute for poultry." *Id.* at 56,625.

## C. *Procedural History*

Levine filed suit on November 21, 2005, claiming that "inhumane methods" of poultry slaughter increased the risk of food-borne illnesses to the plaintiff consumers and health and safety dangers plus "aesthetic injury" to the plaintiff poultry workers. In the operative Second Amended Complaint ("SAC"), Levine asserted that, in issuing the Notice, USDA had violated the HMSA of 1958, abused its discretion, and

---

[6]It did so once more by analyzing the HMSA of 1978 in connection with a 1996 request that the agency issue humane slaughter regulations pursuant to the PPIA. It took similar positions in letters authored in 2004 and 2005.

acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA"). In the SAC's "Request for Relief," Levine sought an order: (1) "declaring USDA's decision to exclude chickens, turkeys, and other poultry species from the protections provided by the Humane Methods of Slaughter Act of 1958 . . . to be . . . not in accordance with the HMSA of 1958 and the APA;" (2) "declaring unlawful and setting aside USDA's September 28, 2005 Federal Register Notice containing the agency's policy statement . . . that the Humane Methods of Slaughter Act of 1958 . . . does not require 'humane handling and slaughter' for poultry;" and (3) "enjoining USDA from excluding chickens, turkeys, and other poultry species from the protections provided by the Humane Methods of Slaughter Act of 1958 . . . ."

On September 6, 2006, the district court denied USDA's motion to dismiss, concluding that Levine had standing because the alleged injuries were redressable, and that the Notice constituted final agency action and thus was subject to judicial review. On February 28, 2008, in connection with cross-motions for summary judgment, the district court ruled in USDA's favor on the merits pursuant to an analysis under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The district court entered a Judgment dismissing the action that same day.

## II.  STANDARD OF REVIEW

*De novo* review applies to both the district court's grant of summary judgment and to questions of statutory interpretation under *Chevron*. *See J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1047 (9th Cir.), *cert. denied sub nom.*, *J & G Sales Ltd. v. Sullivan*, 552 U.S. 887 (2007). The district court's determination on the issue of standing is also reviewed *de novo*, including with respect to its redressability determination. *See Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009); *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 678 (9th Cir. 2007). Where standing is raised in connec-

tion with a motion to dismiss, the court is to " 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.' " *Thomas*, 572 F.3d at 760 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

This court may affirm on any ground supported by the record. *See Pritikin v. Dep't of Energy*, 254 F.3d 791, 796 (9th Cir. 2001), *cert. denied*, 534 U.S. 1133 (2002).

## III.  ANALYSIS

On appeal, before addressing the substantive merits of the case, USDA resurrected its contention that Levine lacked Article III standing. USDA did not file a cross-appeal, but it need not have done so in order to argue that issue here. *See Biggs v. Best, Best & Krieger*, 189 F.3d 989, 998 n.7 (1999) (" 'It is . . . our obligation to be sure that standing exists . . . .' ") (quoting *San Francisco Drydock, Inc. v. Dalton*, 131 F.3d 776, 778 (9th Cir. 1997)).

**[1]** Levine had the burden below of establishing the three elements of Article III standing: (1) that plaintiffs had suffered an injury in fact that was concrete and particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged conduct; and (3) that the injury was likely to be redressed by a favorable court decision. *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("*Defenders of Wildlife*"). On appeal, USDA challenges only the district court's redressability determination. Here, a key to assessing the redressability issue is the fact that the only enforcement mechanism contained within the HMSA of 1958 was repealed in 1978.

**[2]** The district court relied upon the rule that a plaintiff "must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress

his injury," citing *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994) (emphasis in *Beno*). Levine also stresses that point on appeal. The difficulty with the district court's standing analysis, however, is that the "likely" standard is altered somewhat when third parties not before the court must change their behavior in order for any injury suffered to be redressed. As the Supreme Court put it in *Defenders of Wildlife*:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction — and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not pre-

cluded, but it is ordinarily "substantially more diffi-
cult" to establish.

504 U.S. at 561-62 (internal citations omitted); *see also Simon
v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-43
(1976); *Massachusetts v. EPA*, 549 U.S. 497, 543 (2007)
(Roberts, J., dissenting); *Utah v. Evans*, 536 U.S. 452, 511
(2002) (Scalia, J., dissenting). Of course, as the Supreme
Court later made clear (if to that point it had been unclear),
even if "it does not suffice if the injury complained of is 'the
result [of] the independent action of some third party not
before the court,' that does not exclude injury produced by
determinative or coercive effect upon the action of someone
else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (emphasis
and internal citations omitted).

Though it obviously recognized that the redressability ele-
ment herein relied upon the actions of third parties not before
the court (*i.e.*, poultry processors and slaughterhouses) and
that the HMSA of 1958 presently contains no statutory
enforcement mechanisms, the district court nevertheless con-
cluded that redressability was likely because of the availabil-
ity of an alternative method of enforcement. The district court
believed that the Secretary could — and likely would —
enforce humane slaughter requirements through the FMIA
and that legislation's grant of authority to the Secretary to
include whatever additional "species of livestock" he or she
"consider[ed] appropriate" within the scope of the humane
slaughter requirements set forth in the FMIA and the HMSA
of 1958. *See* Pub. L. 109-96 § 798; *see also* 21 U.S.C.
§ 601(w). Of course, in *Defenders of Wildlife*, the Supreme
Court rejected speculation, even when it took the form of
"confiden[t]" speculation. *Defenders of Wildlife*, 504 U.S. at
569-70.

**[3]** While it is true that the processors/slaughterhouses
would be the only technical third parties necessary for redres-
sability here, the Secretary's actions under the FMIA are

equally outside the scope of this lawsuit (which seeks declara-tory/injunctive relief solely as to the HMSA of 1958), and therefore subject to some significant measure of speculation. In this regard, the district court and the parties appear to have overlooked *Fernandez v. Brock*, 840 F.2d 622 (9th Cir. 1988), a case which admittedly preceded *Defenders of Wildlife* by four years. Though dealing with a quite different subject mat-ter, that case is instructive, and arguably determinative, here.

In *Fernandez*, this court concluded that it was "speculative at best whether a court order compelling the Secretary [of Treasury and other federal officials and agencies] to promul-gate regulations" under ERISA would enlarge farmworkers' pension benefits and thus give the plaintiffs standing. *Id.* at 627. It reached that conclusion because of the multiple unknown questions such a course would raise: 1) whether the regulations would have eligibility thresholds meaningfully lower than the present standard; 2) whether the employer would continue to maintain a pension plan at all under such new regulations where he was not required to do so and no one could predict what the regulations might require; and 3) whether the farmworkers would meet whatever eligibility standard the employer would set in connection with such unknown regulations. *See id.* at 627-28; *see also Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984); *Salmon Spawning*, 545 F.3d at 1228-29. This court later summarized *Fernandez* in a way that makes its application to the instant situation all but undeniable:

> In *Fernandez*, plaintiffs were migrant workers seeking a court order to force the Secretary of Labor to establish regulations that might affect their eligi-bility for retirement benefits. However, because any increase in the benefits for which plaintiffs would be eligible was entirely contingent upon the actual con-tent of the regulations the Secretary would ultimately establish, as well as the actions of plaintiffs' private employer, the court could not say with any degree of

confidence that granting the plaintiffs their requested relief would benefit them.

*Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994).

[4] Because of the repeal of the only enforcement provision that had ever been present in the HMSA of 1958, a not-entirely-dissimilar set of speculative steps would have to occur here. First, the Secretary would have to make the independent policy determination (taking into consideration the ruling in this case or not) that he should deem chickens, turkeys and birds to be "amenable species" because, without the threat of enforcement afforded by the FMIA, it is exceedingly difficult to say that any change Levine wants from the processors/slaughterhouses would be "likely." However, a decision from this court (that the phrase "other livestock" in the HMSA of 1958 includes poultry) would not mandate or otherwise compel the Secretary to conclude that poultry should be added as an "amenable species" in the FMIA, 21 U.S.C. § 601(w).[7] Second, even if the Secretary were to add poultry as an "amenable species" to the FMIA, the Secretary would then have to issue regulations of uncertain content (if not uncertain nature).[8] Third, the chicken, turkey and domestic

---

[7]The need to invoke the application of an entirely separate statute and its enforcement provision is what principally distinguishes this case, as it relates to the question of "likely" enforcement, from *Artichoke Joe's v. Norton*, 216 F. Supp.2d 1084, 1107-09 (E.D. Cal. 2002), *aff'd*, 353 F.3d 712, 719 n.9 (9th Cir. 2003) (indicating that the federal government's "enforcement responsibilities" would have remained applicable even if a plaintiff victory would have precluded state enforcement), and the decisions addressed therein. This case is also plainly distinguishable from *Federal Election Commission v. Akins*, 524 U.S. 11, 25 (1998), where the only question was whether the agency would exercise discretion to enforce where it unmistakably had the power to enforce, and *Graham v. Fed. Emergency Mgmt Agency*, 149 F.3d 997, 1003 (9th Cir. 1998), where the non-party was obligated under a mandatory and binding agreement to disburse any funds to the plaintiffs should they prevail in the action.

[8]Because the substance of the regulations the Secretary would or would not eventually issue in response to a victory for Levine in this litigation

bird processors would then have to abide by those regula-tions, whatever they might be. Even if, in line with *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1108 (E.D. Cal. 2002), *aff'd*, 353 F.3d 712, 719 n.9 (9th Cir. 2003), this court could be confident that the processors would comply, that assump-tion is in truth itself little more than guess-work given the speculation inherent in 1) concluding that the Secretary would apply the "amenable species" designation and 2) presuming the terms of any follow-on regulations.

---

is entirely unknown, it cannot even be determined "likely" that such regu-lations would resolve the particular harms — physical, economic or aes-thetic — that the various plaintiffs have alleged in the SAC.

For example, Levine pled that redressability was satisfied because, if she prevailed, "the number of chickens and other birds slaughtered inhu-manely will be reduced, thus decreasing her risk of contracting food-borne illness . . . ." However, since the 1957 enactment of the PPIA, the USDA has had the authority to inspect and otherwise regulate the slaughterhouse facilities for poultry products in order to reduce the risk of poisonous or deleterious substances in or on poultry sold for consumption. *See* 21 U.S.C. §§ 451-71. Pursuant to the PPIA and the FMIA, the USDA has already issued regulations (*see*, *e.g.*, 9 C.F.R. part 416) governing how an "establishment must be operated and maintained in a manner sufficient to prevent the creation of insanitary conditions and to ensure that product is not adulterated." 9 C.F.R. § 416.1. Moreover, the USDA has also already promulgated regulations (*see* 9 C.F.R. part 417) which require meat pro-ducing establishments to have conducted "a hazard analysis to determine the food safety hazards reasonably likely to occur [at various points] in the production process and identify the preventive measures the establishment can apply to control those hazards." 9 C.F.R. § 417.2(a)(1). Among the types of food safety issues to be considered are: "natural toxins," "micro-biological contamination," "zoonotic diseases," and "decomposition." *Id.* at § 417.2(a)(3). One of the "processing categories" which is to be ana-lyzed for food safety risks (and concomitant preventative measures) is the slaughter stage. *Id.* at § 417.2(b)(1). Given the current existing regulations covering the subject of the prevention of food-borne illnesses as to poul-try, it is entirely speculative as to what (if any) new regulations would be promulgated in that area as a result of the addition of poultry as an "ame-nable species."

**[5]** In other words, using *Bennett*'s terminology, the "determinative or coercive effect" would not run from this court's ruling on the meaning of "livestock" in the HMSA of 1958, but from the Secretary's independent decision to accord chickens, turkeys and other domestic birds "amenable species" status under the 2005 amendments to the FMIA. However, that decision is not at issue in this lawsuit. Further, that decision may be subject to a number of political and legal factors quite independent from this court's determination with respect to the meaning of the HMSA of 1958,[9] including whether the Secretary could take any such action in a way that would not be inconsistent with provisions of the PPIA. It is therefore simply impossible for the court to predict that such action "will be made" or is even "likely" within the analysis established as appropriate by *Defenders of Wildlife*. As such, Levine's injuries are not redressable and that claim fatally suffers from a lack of Article III standing, a conclusion which this court has reached in other similar circumstances. *See, e.g.*, *Renee v. Duncan*, 573 F.3d 903, 909-12 (9th Cir. 2009); *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1019-20 (9th Cir. 2002), *cert. denied*, 540 U.S. 875 (2003); *Pritikin*, 254 F.3d at 799-800; *Fernandez*, 840 F.2d at 627-28.

Levine argues that redressability is no more speculative here than in *Tozzi v. U.S. Dep't of Health and Human Services*, 271 F.3d 301 (D.C. Cir. 2001), where the D.C. Circuit

---

[9]Though the remarks came at a time when the district court had already decided the standing issue, Levine's counsel effectively acknowledged this uncertainty at the summary judgment hearing when asked why Congress had not done something "clear and definitive":

> Certainly, I know my clients have talked to Congress about clarifying what the language actually says. But why Congress hasn't acted, I'm not quite sure. We know it's not because people aren't interested. The Notice says that 13,000 people wrote in about this particular issue. People really care about this issue.

Just as Levine's counsel could not pinpoint the reason behind Congressional inaction, there are many factors the Secretary would have to take into consideration in determining whether to exercise his authority pursuant to section 601(w).

found no problem with Article III standing. In *Tozzi*, the Secretary of Health and Human Services, acting pursuant to a requirement of the Public Health Service Act, upgraded dioxin from a substance that was "reasonably anticipated to be" carcinogenic in humans to a "known" human carcinogen. *See id.* at 303. "A manufacturer of products that release dioxin when incinerated, together with others alleged affected by the upgrade," filed suit. *See id.* The D.C. Circuit noted that, although the listing of dioxin as a "known" human carcinogen did not, by itself, lead to regulation of the substance by the Department of Health and Human Services, a listing, or in some instances, an upgrade, might trigger obligations under other agency regulations and state regulations. *See id.* at 304. In that case, the D.C. Circuit concluded that were it to set aside the Secretary of Health and Human Service's upgrade decision, there would be no other determination by the United States government on record pointing to dioxin as a "known" human carcinogen, state and local governments would be less likely to regulate it, and healthcare companies would in turn be less likely to stop using plastic containing it. *See id.* at 309-10. All of this would have the effect of redressing "at least some" of the economic injury suffered by a manufacturer of disposable plastic connectors used during open heart surgery. *See id.* at 307, 310.

The *Tozzi* court's conclusion — that "at least some" of the plaintiffs' economic injury would be redressable — is seemingly unassailable, even if all of the constituent parts of its reasoning are not. For instance, it was not at all speculative for the D.C. Circuit to conclude that an order setting aside the Secretary's listing of dioxin as a "known" carcinogen would have the "likely" effects of 1) precluding "dioxin activists" from "point[ing] to an authoritative determination by the United States government that dioxin is 'known' to cause cancer in humans" and 2) permitting the manufacturer to point to that same authoritative list as no longer listing dioxin as a "known" human carcinogen. *See id.* at 309-10. This, seemingly by itself, would have provided redressability for "at

least some" of the manufacturer's injury. This court could therefore agree with the *Tozzi* holding even if it disagreed with its reasoning with respect to the likely regulatory decisions of state and local governments. *See id.* at 310. On that latter point, *Tozzi* would appear to be inconsistent with this court's opinions in *Fernandez*, *Renee* and *Pritikin*.

Levine also argues that at least contractors selling poultry to the federal government would have to comply with regulations passed under the HMSA of 1958 notwithstanding the absence of an enforcement provision in that statute, because of 48 C.F.R. § 52.212-4(q). That Federal Acquisition Regulation provides that any such contractor "shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract." *Id.* Yet, Levine has not demonstrated that any humane slaughter regulation would be "applicable to [a contractor's] *performance*" under a contract which merely calls for the provision or delivery of poultry products to the Government. Levine also has not pointed to or alleged the existence of any poultry processor-government contract which actually contains or incorporates section 52.212-4(q) as a term (although they seemingly could have easily done so).[10] Even

---

[10]In addition, it is not entirely clear from the record that Levine even raised this particular argument below. *Cf. Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 178 (3d Cir. 2001) (refusing to consider plaintiffs' Article III standing argument which was not raised until reply brief); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487 n.4 (9th Cir. 1995) ("It is not at all clear that [the plaintiff] raised the issue of third-party standing before the district court. If it did not, it has waived the argument on appeal."); *Bd. of Natural Res. v. Brown*, 992 F.2d 937, 945-46 (9th Cir. 1993) ("Unlike the requirement that a litigant demonstrate an injury in fact, the rule against third-party standing is not a jurisdictional limitation on our review, but a prudential one."). *But see* Appellants' Excerpts of Record at 476; *Thompson v. County of Franklin*, 15 F.3d 245, 248-49 (2d Cir. 1994) (concluding that appellate court is required to consider all possible arguments supporting a plaintiff's standing, whether or not plaintiff has made them); *Sherman v. SEC (In re Sherman)*, 491 F.3d

if all of those problems were taken care of, however, Levine still runs into the difficulty of not being able to demonstrate that it is likely that the content of any regulations USDA might issue and which might, therefore, be in some sense applicable through 48 C.F.R. § 52.212-4(q), would actually redress the particular harms they claim.

**[6]** Finally, although the district court considered the redressability issue at the motion to dismiss stage, a court's obligation to take a plaintiff at its word at that stage in connection with Article III standing issues is primarily directed at the injury in fact and causation issues, not redressability. *See Defenders of Wildlife*, 504 U.S. at 561 ("At the pleading stage, general factual allegations *of injury resulting from the defendant's conduct* may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.' ") (emphasis added) (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) (ruling, without specifying whether it was considering redressability, that "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party").[11] *But see Am. Fed'n of Gov't. Employees*

948, 957 (9th Cir. 2007) (reciting — in the context of a *challenge* to standing — the familiar rule that the issue of Article III standing must be considered on appeal regardless of whether it was raised below); *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 999 (9th Cir. 2005) (permitting parties to "bolster" their defense to opposing party's challenge to standing by way of particular standing argument not raised below).

[11]*Warth* appears to have predated the Supreme Court's *specification* of redressability as a *separate* standing element (though, as part of the Article III standing requirement, it was assuredly always there). *See Defenders of Wildlife*, 504 U.S. at 561 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976), for the redressability requirement). The *Warth* Court, therefore, arguably did not have that element in mind when addressing a court's role at the motion to dismiss stage (though *Simon*, the precursor to *Defenders of Wildlife* on this point, itself drew from *Warth* for the redressability requirement).

*Local 1 v. Stone*, 502 F.3d 1027, 1032-33 (9th Cir. 2007); *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 870 (9th Cir. 2002). Even accepting the allegations in the SAC as true, Levine did not plead any facts demonstrating that the Secretary of Agriculture would act to include chickens, turkeys and other birds as "amenable species" under the FMIA. *See Fernandez*, 840 F.2d at 625-26 (reviewing the standing issue by accepting as true all material allegations of the complaint notwithstanding that appeal was from summary judgment ruling). Absent such factual allegations, any pleading directed at the likely actions of third parties or of parties under separate and independent statutory obligations would almost necessarily be conclusory and speculative.

## IV.  CONCLUSION

[7] Because Levine's alleged injuries are not redressable by way of this lawsuit, there is a lack of standing to proceed with this action. Consequently, the decision of the district court granting the USDA's motion for summary judgment is vacated and the case is remanded with instructions to dismiss.[12]

**VACATED AND REMANDED**.

---

[12]Because we decide this case on a threshold lack of standing ground, we do not reach the other substantive issues raised on this appeal. *See Fox v. Smoker (In re Noblit)*, 72 F.3d 757, 759 (9th Cir. 1995).