PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BLAUSTEIN & REICH, INCORPORATED,
d/b/a Bob's Gun & Tackle Shop,
*Plaintiff-Appellant,*

v.

BRADLEY A. BUCKLES, Director,
Bureau of Alcohol, Tobacco,
Firearms, and Explosives,
*Defendant-Appellee.*

No. 02-2329

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., District Judge.
(CA-01-875-2)

Argued: October 30, 2003

Decided: April 21, 2004

Before WILKINS, Chief Judge, and NIEMEYER and
SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Shedd wrote the opinion, in
which Chief Judge Wilkins and Judge Niemeyer joined.

## COUNSEL

**ARGUED:** Stephen Porter Halbrook, Fairfax, Virginia, for Appellant. Lewis Stanley Yelin, Appellate Staff, Civil Division, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for

Appellee. **ON BRIEF:** Richard E. Gardiner, Fairfax, Virginia, for Appellant. Robert D. McCallum, Jr., Assistant Attorney General, Paul J. McNulty, United States Attorney, Mark B. Stern, Michael S. Raab, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Joel J. Roessner, Deputy Associate Chief Counsel (Litigation), Abigail Roth, Lauren L. Bernick, Office of Chief Counsel, BUREAU OF ALCOHOL, TOBACCO, FIRE-ARMS & EXPLOSIVES, Washington, D.C., for Appellee.

---

## OPINION

SHEDD, Circuit Judge:

In February 2000, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the Bureau)[1] sent letters to approximately 450 federally licensed firearms dealers — fewer than one percent of the more than 80,000 such dealers throughout the nation — demanding information relating to their acquisitions of secondhand firearms in 1999. Blaustein & Reich, Inc., d/b/a Bob's Gun & Tackle Shop (Bob's Gun Shop), a licensed dealer in Norfolk, Virginia, is one of the dealers that received this demand letter.

Rather than produce the information requested by the Bureau, Bob's Gun Shop filed suit, claiming the Bureau exceeded its statutory and regulatory authority in issuing the demand letters. Bob's Gun Shop also asserted that the criteria used by the Bureau to target the selected dealers were arbitrary and capricious.

The district court granted summary judgment in favor of the Bureau, and Bob's Gun Shop now appeals.[2] We affirm.

---

[1]Congress recently reconfigured the Bureau of Alcohol, Tobacco, and Firearms, changing its name in the process to the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Homeland Security Act of 2002, Pub. L. No. 107-296, § 1111(a)(1), 116 Stat. 2135, 2274 (2002).

[2]Bob's Gun Shop suggests this case is moot because the Bureau changed some of the selection criteria for its new demand letter issued in 2002. We disagree. The changed criteria apply only to demand letters issued after 2002. Thus, the change in criteria does not affect the issue in this case — whether the criteria used to select Bob's Gun Shop to receive the 2000 demand letter were arbitrary and capricious.

## I.

The Gun Control Act (GCA) of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968)(codified as amended at 18 U.S.C. §§ 921-930), authorizes the Bureau to license manufacturers, importers, and dealers of firearms. *See* 18 U.S.C. § 923(a).[3] The Bureau is required to issue a license to any applicant that meets all the statutory qualifications and agrees to abide by the applicable laws. *Id.* § 923(d). A manufacturer, importer, or dealer that holds such a license is commonly referred to as a federal firearms licensee (an FFL). Bob's Gun Shop is an FFL dealer.

Pursuant to both its statutory and regulatory authority, the Bureau requires all FFLs to maintain extensive records relating to the firearms they manufacture, import, receive, or sell. *See, e.g., id.* § 923(g)(1)(A); 27 C.F.R. § 478.121(a).[4] For dealers, this documentation includes the name of the firearm's manufacturer and/or importer, model, serial number, type, caliber or gauge, date of sale or receipt, and name and address of the transferor or transferee. 27 C.F.R. § 478.125(e). The Bureau has some access to this information but only as authorized by statute or regulation. The Bureau may, for instance, inspect an FFL's records without warrant to determine the disposition of a particular firearm during the course of a criminal investigation. 18 U.S.C. § 923(g)(1)(B)(iii). The Bureau may also require FFLs to provide record information by telephone to help

[3]The GCA originally granted the Secretary of the Treasury the authority to issue licenses. The Secretary delegated this authority to the Bureau. As part of the Homeland Security Act of 2002, the licensing authority was transferred to the Department of Justice. Pub. L. No. 107-296, § 1112 (f)(6), 116 Stat. 2135, 2276 (2002). The Attorney General of the United States, in turn, delegated the licensing authority to the newly reconfigured Bureau. 28 C.F.R. § 0.130 (a)(1). For sake of simplicity, we refer to the Bureau as the governmental agency empowered by Congress to perform the functions relevant to this case.

[4]Our prior cases dealing with the extent of the Bureau's authority refer to 27 C.F.R. § 178, not § 478. As part of the reconfiguration of the Bureau and the transfer of some of its functions from the Department of the Treasury to the Department of Justice, § 178 was recently redesignated as § 478. *See* 68 Fed. Reg. 3750 (Jan. 24, 2003).

determine the disposition of a particular firearm in the course of a criminal investigation. 18 U.S.C. § 923(g)(7). An FFL must respond to such a request within twenty-four hours. *Id.*

Based on its authority to request record information from FFLs, the Bureau has created a firearms tracing system to track the movement of a particular firearm from its manufacturer to the retail dealer and ultimately to the firearm's first retail buyer. The Bureau has established the National Tracing Center (NTC) to conduct this tracing function. A firearms trace typically ensues after a law enforcement agency recovers a "crime gun" — a firearm recovered from a crime scene or from a suspect, felon, or other prohibited person. J.A. 85. The law enforcement agency — local, state, federal, or international — contacts the NTC. Based on the make of the firearm, the NTC contacts the manufacturer of the firearm and tracks the movement of the weapon through the chain of distribution ultimately to the FFL dealer who sold the firearm to the first nonlicensee, a retail purchaser. When requested by the NTC, the FFL in the chain of distribution must report all or any portion of the information it is statutorily required to maintain for each firearm, including the name and address of the individual or entity who purchased the firearm.

This tracing system breaks down once the Bureau determines that the first retail buyer sold or otherwise transferred the firearm to another because retail buyers are not required to maintain records of any "secondhand" sales or transfers. The Bureau must then rely primarily on investigative interviews of the individuals involved in the secondhand chain of distribution to have any hope of tracing a firearm. These interviews are so time-consuming and often unproductive that the Bureau rarely performs an investigative trace of a secondhand firearm.

FFL dealers, on the other hand, are required to maintain records of secondhand firearms that they receive or sell. 27 C.F.R. § 478.125(e). This information, however, is difficult for the Bureau to access, because once the initial chain of distribution among FFLs is broken, the Bureau does not typically know which FFL dealer received or sold a particular secondhand firearm without conducting an investigative trace.

In the last several years, the Bureau has increased its efforts to trace crime guns and analyze the data relating to these traces.[5] Based on traces performed in 1999, the Bureau determined that just 1.2% of FFL dealers — approximately 1,000 of the more than 80,000 FFL dealers — accounted for more than half of all crime guns traced. During this same period, the Bureau also determined that approximately 450 FFL dealers had traced to them ten or more crime guns with a "time-to-crime" of three years or less. Time-to-crime is the time from the retail sale of a firearm to the time it is recovered at a crime scene or is traced.[6] The average time-to-crime is six years.

Based on this data, the Bureau sent demand letters to the approximately 450 FFL dealers identified as having ten crime guns with a time-to-crime of three years or less. The demand letter required the selected FFLs to produce certain record information relating to all secondhand firearms it acquired in 1999. Bob's Gun Shop was among the FFL dealers that received the Bureau's letter. It is undisputed that Bob's Gun Shop had ten crime guns with a time-to-crime of three years or less traced to it in 1999.[7]

---

[5]In February 2000, the Bureau published a comprehensive report, *Commerce in Firearms in the United States*, that contains much of the data and analysis the Bureau relied on in determining which FFL dealers should receive its demand letter.

[6]The Bureau imprecisely defined "time-to-crime" in its demand letter. It is clear, however, that the Bureau used the broader definition of "time-to-crime" in *Commerce in Firearms in the United States* in its selection criteria.

[7]Bob's Gun Shop argues that at least some of the traces should not be counted because the particular guns did not end up at a crime scene through any fault of Bob's Gun Shop or the individual to whom it sold the firearm. For instance, two firearms were traced because they were stolen from the individuals to whom Bob's Gun Shop sold them.

Whether Bob's Gun Shop or its buyers were involved in any wrongdoing relating to any particular firearm that was traced is immaterial. The Bureau based its selection on which FFL dealers had ten or more qualified traces. The Bureau did not include in its criteria whether a particular trace implicated the FFL dealer in illegal trafficking of firearms. It is undisputed that Bob's had at least ten firearms traced to it in 1999 and these firearms had a time-to-crime of three years or less.

The Bureau's demand letter stated that its research revealed that "a high volume of gun traces with a short 'time-to-crime' may be an indicator of illegal firearms trafficking." J.A. 54. The Bureau also asserted that the targeted dealers' unusually high number of traces of new firearms "may mean that you are also selling a high volume of secondhand guns used in crime." *Id.* The letter assured the targeted FFL dealers, however, that the data did not necessarily indicate that the FFL dealers had violated any gun control laws or regulations. Nevertheless, the Bureau demanded that the targeted FFL dealers provide some limited information regarding all of the secondhand firearms they acquired in 1999 for use in tracing secondhand firearms recovered at crime scenes.

## II.

Rather than comply with the Bureau's demand letter, Bob's Gun Shop filed suit seeking declaratory and injunctive relief. In particular, Bob's Gun Shop claimed that the demand letter exceeded the Bureau's statutory authority to obtain information and, in effect, created a national firearms registry. It also alleged that the Bureau's criteria for selecting the FFL dealers — those having ten crime gun traces without any consideration of the particular dealer's sales volume — was arbitrary and capricious.

In a thorough opinion, the district court granted summary judgment in favor of the Bureau as to all of the claims raised by Bob's Gun Shop. *Blaustein & Reich, Inc. v. Buckles*, 220 F. Supp. 2d 535 (E.D. Va. 2002). After the district court denied its motion to alter or amend the judgment, Bob's Gun Shop filed this appeal.

## III.

We review the district court's grant of summary judgment de novo. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Although we view the evidence in the light most favorable to the non-moving party,[8] we review any conclusions of law de novo. *Dixon v.*

---

[8]The facts are not in dispute. The district court adopted the statement of facts in the Bureau's memorandum in support of its motion for summary judgment because Bob's Gun Shop did not take issue with that statement. Bob's Gun Shop does not contest the district court's adoption of the Bureau's statement of facts.

*Edwards*, 290 F.3d 699, 710 (4th Cir. 2002). In particular, we review questions of statutory interpretation de novo. *United States v. Abuagla*, 336 F.3d 277, 278 (4th Cir. 2003).

IV.

A.

Bob's Gun Shop argues that the Bureau may seek records and information under its demand letter authority only in the course of a criminal investigation or if the FFL has failed to comply with other reporting requirements of the GCA. We disagree.

As part of the Firearms Owners' Protection Act (FOPA) of 1986, Pub. L. No. 99-308, § 103, 100 Stat. 449 (1986), which amended the GCA, Congress gave the Bureau broad authority to seek, by demand letter, all record information that FFLs are required to maintain. The 1986 amendment provides:

> Each licensee shall, when required by letter issued by the [Bureau], and until notified to the contrary in writing by the [Bureau], submit on a form specified by the [Bureau], for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the [Bureau] in such letter may specify.

18 U.S.C. § 923(g)(5)(A).[9]

Under the GCA, Bob's Gun Shop is required, as an FFL dealer, to maintain a complete set of records regarding all firearms, including secondhand firearms, that it acquires or transfers. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.121. For each firearm that it receives, Bob's Gun Shop must keep a record of the name and address of the person from whom it was received, the date of receipt, its manufac-

---

[9]The demand letter also required the recipients to continue to submit reports of their secondhand firearm acquisitions on a quarterly basis until the Bureau advised otherwise. Section 923 (g)(5)(A) authorizes the Bureau to require continuing reports.

turer and/or importer, serial number, model, type, and caliber or gauge. *See* 27 C.F.R. § 478.125 (e).

The Bureau's demand letter requests only a portion of the information that Bob's Gun Shop is required to maintain. Specifically, the demand letter seeks only the name of the firearm's manufacturer and/or importer, its model, caliber or gauge, and serial number. The Bureau specifically directed the FFL dealers not to provide the name and address of the individual from whom the FFLs acquired the firearm. Thus, the Bureau acted within its statutory authority under 18 U.S.C. § 923(g)(5)(A) when it issued the demand letter in question.

Nevertheless, Bob's Gun Shop contends that another FOPA provision, now codified at 18 U.S.C. § 923(g)(1)(A), limits the Bureau's authority to issue demand letters. This provision, although it requires FFLs to "maintain . . . records of importation, production, shipment, receipt, sale or other disposition of firearms" in their possession, also provides that these FFLs "shall not be required to submit to the [Bureau] reports and information with respect to such records and the contents thereof, *except as expressly required by this section*." 18 U.S.C. § 923 (g)(1)(A)(emphasis added). Bob's Gun Shop contends, in effect, that § 923(g)(1)(B) is the only part of § 923 that defines when the Bureau can seek information from FFLs. Subsections of 923(g)(1)(B) authorize the Bureau to inspect or examine the records that an FFL is required to maintain to ensure that FFLs are complying with their record keeping obligations[10] or to determine the disposition of a firearm in the course of a criminal investigation.[11] *Id.* § 923(g)(1) (B)(ii)-(iii).[12] Bob's Gun Shop argues that the Bureau's demand letter

---

[10]The Bureau does not assert that Bob's Gun Shop has failed to comply with any recordkeeping requirement apart from the demand letter.

[11]The Bureau concedes that it is not seeking the information demanded in its letter in connection with a particular criminal investigation.

[12]Section 923(g)(1)(B)(ii)-(iii) states:

The [Bureau] may inspect or examine the inventory and records of a . . . licensed dealer without such reasonable cause or warrant — . . .

(ii)   for ensuring compliance with the record keeping requirements of this chapter . . . ; or

(iii)   when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

does not fall within these specific circumstances, so the Bureau has no authority to require Bob's Gun Shop to produce the information requested in the demand letter.[13]

This argument ignores the plain language of § 923(g)(1)(A), which protects FFLs from reporting requirements "except as expressly required by this section." Section 923(g)(5)(a) expressly requires an FFL to produce record information when the Bureau issues a demand letter seeking it.[14] Thus, we hold that the Bureau, when acting pursuant to § 923(g)(5)(A), is not restricted to issuing demand letters in connection with a criminal investigation or to noncompliant FFLs.

B.

Bob's Gun Shop also contends that the Bureau's demand letter violates the statutory ban on creating a national registry of firearms. It argues that the Bureau's demand letter authority, which is granted by statute at § 923(g)(5)(A) and by regulation at 27 C.F.R. § 478.126, is limited by both 18 U.S.C. § 926(a) and a rider that has accompanied every enactment providing appropriations to the Bureau since 1978.

First, we conclude that the limitation in § 926(a) does not apply to

---

[13]Bob's Gun Shop also argues that § 923(g)(7) limits the Bureau's ability to seek record information to firearm traces in specific criminal investigations. Section 923(g)(7) does not expressly limit the Bureau's authority to demand information. Instead, it merely requires an FFL, when the Bureau makes a request in connection with the disposition of a firearm in the course of a criminal investigation, to produce record information within twenty-four hours. The demand letter in this case does not relate to a trace being conducted in the course of a criminal investigation and does not require Bob's Gun Shop to produce any information within twenty-four hours. Thus, § 923(g)(7) does not limit the Bureau's authority to issue demand letters like the one issued to Bob's Gun Shop.

[14]Section 923(g)(5)(A) contains a condition precedent. It requires an FFL to submit record information to the Bureau but only if the Bureau issues a demand letter requesting it. This condition precedent does not negate the fact that § 923(g)(5)(A) contains an *express requirement* that is provided for in § 923(g)(1)(A).

the Bureau's regulatory demand letter authority. Section 926(a) provides in pertinent part:

> *No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act [in 1986]* may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States . . ., nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.

(Emphasis added). It is clear from the plain language of this statute that Congress prohibits the Bureau or any other federal agency from promulgating any new rules or regulations that would create a national firearms registry. What is equally clear from the plain language of this statute is that its limitations do not apply to rules or regulations that were prescribed by a federal agency before the enactment of FOPA in 1986. The Bureau's regulation authorizing it to issue demand letters, found at 27 C.F.R. § 478.126, was promulgated in 1968. 33 Fed. Reg. 18,555 (Dec. 14, 1968). Thus, the statutory prohibition in § 926(a) on new rules and regulations does not apply to the Bureau's regulatory demand letter authority under § 478.126.[15]

Second, we also conclude that the annual appropriations riders do not prohibit the Bureau from issuing the demand letter in this case.

---

[15]Bob's Gun Shop included in its briefs considerable discussion of the legislative history of § 923(g)(5)(A) and § 926(a), which it claims shows that Congress intended to limit the use of demand letters to criminal investigations and to noncompliant FFLs. Because we find the statute unambiguous on its face, we do not resort to legislative history to determine what Congress intended its enactments to mean. We derive the meaning of the enactment solely from the plain meaning of the words Congress used. *See Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996) ("If the statutory language is clear and unambiguous, our inquiry ends there . . . ; we neither resort to an examination of the statute's legislative history nor apply the traditional rules of statutory construction.").

The rider prohibits the Bureau from spending funds for salaries and administrative expenses "in connection with consolidating or centralizing . . . the records, or any portion thereof, of acquisition and disposition of firearms maintained by" FFLs. *See, e.g.*, Appropriations, 2000 — Treasury, Postal Service, Executive Office of the President, and General Government, Pub. L. No. 106-58, 113 Stat. 430 (1999). Bob's Gun Shop contends that the Bureau's demand letter violates the rider because it effectively consolidates and centralizes records. Taken to its logical end, Bob's Gun Shop's argument would require us to strike down a demand letter requiring just one FFL to report to the Bureau "any portion" of record information as to one firearm. Although we would not hesitate to make such a ruling if we interpreted the plain language of the rider and the GCA to require it, we disagree with Bob's Gun Shop's reading of the rider.

The rider prohibits spending Bureau funds in relation to consolidating or centralizing records that FFLs are required to maintain. The plain meaning of consolidating or centralizing does not prohibit the mere collection of some limited information. Both consolidating and centralizing connote a large-scale enterprise relating to a substantial amount of information.[16] We need not in this case determine the minimum level of record reporting that would trigger the rider's prohibition. Instead, we hold that the Bureau's demand letter in this case — sent to fewer than one percent of all FFLs and requesting only a portion of record information statutorily required to be maintained[17] —

---

[16]Because we conclude that the meanings of consolidating and centralizing are unambiguous, we cannot resort to legislative history to determine the meaning of the words. *See Faircloth*, 91 F.3d at 653. We note, however, that our interpretation of the plain meaning of consolidating and centralizing is entirely consistent with the legislative history of the rider. The first of the annual appropriations riders was enacted in 1978 in response to the Bureau's proposed regulation that would have required every FFL to submit a quarterly report of all dispositions of firearms. *See* 43 Fed. Reg. 11,800-02 (Mar. 21, 1978); *RSM, Inc. v. Buckles*, 254 F.3d 61, 67 (4th Cir. 2001). Thus, the legislative history also suggests that Congress intended to prohibit a large-scale enterprise to consolidate and centralize a substantial amount of FFL record information.

[17]The demand letter in this case requested less extensive record information than the Bureau's demand letter we upheld in *RSM*. In that case,

does not constitute consolidating or centralizing record information.[18]

## C.

Bob's Gun Shop also argues that the Bureau's issuance of demand letters to FFLs who are otherwise in compliance with all record maintenance requirements is a new interpretation by the Bureau of its authority to issue demand letters. It contends that this new interpretation constitutes a new "rule" that violates 18 U.S.C. § 926(a). This argument has two primary flaws.

First, the Bureau's issuance of the demand letter to Bob's Gun Shop and the other similarly situated FFLs does not constitute the making of a new "rule." Bob's Gun Shop argues that the Bureau's demand letter constitutes a new "rule"[19] prescribed in 2000 because

---

the Bureau required the targeted FFLs to produce all their record information regarding all their firearm purchases and sales in the prior three years. *RSM*, 254 F.3d at 63.

In this case, the Bureau's demand letter limited the record request to secondhand firearms purchased in 1999. Rather than produce all the record information in their possession as to these specific firearms, the FFL dealers were instructed not to produce the names and addresses of the individuals from whom the secondhand firearms were acquired.

[18]We noted in *RSM* that our holding was limited to demand letters to noncompliant FFLs. *RSM*, 254 F.3d at 67. We were not confronted in *RSM* with the issue now before us — whether the Bureau is authorized to issue demand letters even when there is no allegation that the targeted FFL dealers have failed to comply with statutory record reporting obligations. We conclude that the Bureau's letter in this case — to fewer than one percent of all FFLs which have not otherwise failed to comply with record reporting requirements — is authorized under § 923(g)(5)(A) and does not violate the appropriations riders' ban on consolidating and centralizing record information. Our analysis of the plain language of the GCA's statutory framework is entirely consistent with the judgment in *RSM* — § 923(g)(5)(A) clearly allows the Bureau to issue demand letters to FFLs that have failed to comply with record reporting requirements.

[19]The Administrative Procedure Act (APA) defines "rule," in pertinent part, as:

the Bureau had never before interpreted its authority under § 478.126 to allow it to issue demand letters to FFLs that otherwise have fully complied with their record keeping requirements. It relies on a line of cases standing for the proposition that when "an agency has given its regulation a *definitive interpretation*, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment" under the APA. *See, e.g.*, *Alaska Prof'l Hunters Ass'n v. Federal Aviation Admin.*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) (emphasis added).

Bob's Gun Shop has failed to show that the Bureau previously definitively interpreted § 478.126 as prohibiting it from issuing demand letters to compliant FFLs.[20] At most, Bob's Gun Shop has

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . .

5 U.S.C. § 551(4). The Bureau's decision to send its demand letter to approximately one percent of all FFLs does not constitute a "rule" as defined by the APA. We agree with the district court that the Bureau's action probably constitutes no more than an informal "adjudication," 5 U.S.C. § 551(7), ordering a discrete group of FFLs to produce select records relating to a specific type of firearm acquisition. *See Blaustein*, 220 F. Supp. 2d at 543 n.9.

[20]Bob's Gun Shop cites, among other documents, to a 1968 letter to Congress in which the Director indicated that the Bureau had no intention of using its demand letter authority to require law abiding gun dealers to report their firearm transactions. *See* 131 Cong. Rec. S9,101-05 (1985). This letter does not rise to the level of establishing a definitive interpretation that would limit the Bureau's authority to issue demand letters only to noncompliant FFLs. The context of the letter makes clear that the Director's main concern was assuring Congress that the Bureau would not use the demand letter to establish a national registry of firearms of all FFLs. Instead, the Director envisioned issuing demand letters only to a small minority of FFLs suspected of illegal trafficking. The demand letter in this case is consistent in significant respect with the Director's 1968 letter. The letter was sent to an extremely small percentage of FFLs that accounted for a significant percentage of new firearms that ended up being recovered at crime scenes or possessed by ineligible persons much sooner than normal.

shown that the demand letter in question is the first seeking information from compliant FFLs, which is far from establishing that the Bureau has now revised its prior, well-established interpretation that allowed demand letters only to noncompliant FFLs.

Second, even if we were to decide that the demand letter constituted a new "rule" prohibited by § 926(a), we would conclude that the Bureau acted within its statutory authority under § 923(g)(5)(A). This statutory provision, which grants the Bureau broad authority to issue demand letters seeking records from FFLs, was enacted at the same time as § 926(a). Section 926(a) prohibits a federal agency from prescribing new *rules or regulations* that require FFLs to report their records. Section 926(a) clearly does not (nor could it) limit Congress from enacting a statutory provision such as § 923(g)(5)(A) that requires FFLs to report their record information when directed by a demand letter issued by the Bureau.

### D.

Finally, Bob's Gun Shop argues that the Bureau's demand letter is arbitrary and capricious because it is based on irrational and inaccurate selection criteria. We disagree.

In its demand letter, the Bureau informed Bob's Gun Shop that it was selected to receive the letter because it had traced to it in 1999 ten crime guns with a time-to-crime of less than three years. The Bureau explained that its research had demonstrated that a high volume of gun traces with a short time-to-crime may indicate illegal firearms trafficking by an FFL dealer. It further noted that these indicators relating to the new firearms sold by Bob's Gun Shop may also mean that Bob's Gun Shop is selling a high volume of secondhand firearms used in crime. The Bureau specifically recognized, however, that these indicators did not establish that Bob's Gun Shop had violated any gun control laws or regulations.

Bob's Gun Shop asserts that it is irrational to assume that just because a gun shop has ten or more new crime gun traces that it might also have a high volume of secondhand guns used in crimes. It also contends that the Bureau's assertion that Bob's Gun Shop had a high volume of crime gun traces in 1999 is misleading. Based on its sales

of nearly 2000 firearms in 1999, Bob's Gun Shop asserts that ten traces is of no significance. Bob's Gun Shop further alleges that two of the ten firearms traced were traced because they were stolen from the individuals to whom Bob's Gun Shop sold them. Thus, these two particular traces negate any inference that Bob's Gun Shop or its customers were involved in diverting any new firearms into the illegal market.

Determining whether an agency action is arbitrary and capricious is subject to a highly deferential standard of review that presumes the validity of the agency action. *Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993). Under this standard, the reviewing court must carefully consider the agency's action to determine whether a rational basis exists for its decision. *Id.* at 1401; *see also Leather Indus. of Am., Inc. v. Environmental Prot. Agency*, 40 F.3d 392, 409 (D.C. Cir. 1994) ("Where the agency's line-drawing does not appear irrational and the [challenger] has not shown that the consequences of the line-drawing are in any respect dire . . . we will leave that line-drawing to the agency's discretion."). Although the court's review of the agency's decision must be searching and careful, the court must not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

We conclude that the Bureau's decision to send demand letters to Bob's Gun Shop and the approximately 450 similarly situated FFLs was neither arbitrary nor capricious. The Bureau's research revealed that this small class of dealers — representing fewer than one percent of the more than 80,000 FFL dealers — accounted for a significant percentage of the new firearm traces performed in 1999. The Bureau did not make the unsubstantiated assumption that these dealers were illegally trafficking in firearms. Indeed, the Bureau was careful to inform these dealers that they were not being accused of any wrongdoing. Instead, the Bureau reasonably deduced that since this small group of dealers was the original source of a disproportionate share of the new firearms that were traced, this same group might also be the source — through illegal or legal means — of a substantial percentage of secondhand firearms that are traced. Although this assump-

tion might ultimately be proved wrong, the Bureau did not act arbitrarily or capriciously in drawing such a conclusion.

## V.

For the foregoing reasons, we hold that the Bureau's demand letter does not violate the GCA or any of its implementing regulations. We further conclude that the Bureau's criteria for choosing which dealers should receive the demand letters were not arbitrary or capricious. Thus, we affirm the judgment of the district court in favor of the Bureau.

*AFFIRMED*