# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 11, 2013

Lyle W. Cayce
Clerk

No. 12-50742

10 RING PRECISION, INC.,

        Plaintiff - Appellant

ROBBY BETTS, doing business as Golden States Tactical,

        Intervenor - Appellant

v.

B. TODD JONES, Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives, in his official capacity,

        Defendant - Intervenor - Appellee

Appeals from the United States District Court
for the Western District of Texas

Before KING, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In July 2011, as part of an effort to combat the illegal trafficking of firearms from the United States to Mexico, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") issued a demand letter to each federal firearms licensee classified as a "dealer" or "pawnbroker" located in Arizona, California, New Mexico, and Texas.[1]  The July 2011 demand letter required its

---

[1] There are nine categories of federal firearms licensees. *See* United States Department of Justice, The Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF Online—Statistics—Listing of Federal Firearms Licensees*, http://www.atf.gov/about/foia/ffl-

recipients to report to ATF whenever "at one time or during any five consecutive business days, [they] sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person." Appellants argue that ATF lacked statutory authority to issue the July 2011 demand letter, and, even if it possessed statutory authority, that its decision to issue the demand letter to the chosen licensees was arbitrary and capricious. We disagree.

## I.

The Gun Control Act of 1968 ("GCA") requires anyone who wishes to "engage in the business of . . . dealing in firearms" to obtain a license.[2] All federal firearms licensees ("FFLs") must create and maintain records of all firearms transactions, including the name, age, and residence of each individual who purchases a firearm.[3] In 1986, Congress amended the GCA with the passage of the Firearms Owners' Protection Act of 1986 ("FOPA").[4] As part of FOPA, Congress enacted 18 U.S.C. § 923(g)(5)(A), which permits ATF to issue demand letters to FFLs to obtain "all record information required to be kept [by the GCA] or such lesser record information."[5] Relying on that authority, ATF issued the July 2011 demand letter in response to its documented investigation of escalating drug violence in Mexico.

A brief background of that investigation, as well as it findings, is helpful in understanding ATF's decision to issue the July 2011 demand letter. In 2007,

---

list.html.

[2] 18 U.S.C. § 923(a). The authority to issue licenses has been delegated to ATF. *See Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 283 n.3 (4th Cir. 2004), *cert denied*, 543 U.S. 1052 (2005).

[3] 18 U.S.C. §§ 922(b)(5), 923(g).

[4] Pub. L. No. 99-308, 100 Stat. 449 (1986).

[5] 18 U.S.C. § 923(g)(5)(A).

ATF began investigating the illegal flow of guns from the United States to Mexico.[6]  William Hoover, Assistant Director of Field Operations for ATF, testified before a subcommittee of the United States House of Representatives in June 2008 that "trace data over the past three years shows that Texas, Arizona and California are the three most prolific states, respectively, for firearms illegally trafficked to Mexico."  He noted that "[although] the [drug trafficking organizations'] 'weapons of choice' had been .38 caliber handguns . . . cartel members and enforcers have now developed a preference for higher quality, more powerful weapons," such as assault rifles.  He also explained that "tracing" of firearms seized in the United States and Mexico plays "an essential part in ATF's firearms trafficking investigations."

In June 2009, the Government Accountability Office ("GAO") released a report entitled *Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges* ("the Report").[7]  According to the Report, "about 27 percent of firearms recovered in Mexico and traced from fiscal year 2004 to fiscal year 2008 were long guns."[8]  Moreover, "[f]rom fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states.  In particular, about 70 percent of those firearms came from Texas, California, and Arizona."[9]  The Report explained that the absence of a multiple sales reporting requirement for long guns poses a challenge for ATF's efforts.  "[T]he federal multiple sales reporting requirement

---

[6] *See* OFFICE OF THE INSPECTOR GEN., I-2011-001, REVIEW OF ATF'S PROJECT GUNRUNNER i (2010).

[7] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-09-709, FIREARMS TRAFFICKING: U.S. EFFORTS TO COMBAT ARMS TRAFFICKING TO MEXICO FACE PLANNING AND COORDINATION CHALLENGES (2009).

[8] *Id.* at 28.

[9] *Id.* at 19.

helps expedite the time required by ATF to complete a gun trace."[10]  Because ATF "does not have information in its multiple sales database on any long guns recovered in crime in Mexico that may have been purchased through a multiple sale,"[11] it usually cannot use its own records to trace those guns. The Report also made clear that "ATF has identified multiple sales or purchases of firearms by a nonlicensee as a 'significant indicator' of firearms trafficking."[12]  The Report's recommendations included a suggestion that ATF investigate potential approaches "to address the challenges . . . regarding the constraints on the collection of data that inhibit the ability of law enforcement to conduct timely investigations."[13]

In May 2010, the Office of the Inspector General ("OIG") issued a review of ATF's efforts to combat firearms trafficking, which noted that "the lack of a reporting requirement for multiple sales of long guns . . . hinders ATF's ability to disrupt the flow of illegal weapons into Mexico."[14]  It also identified data showing that, of the illegally trafficked guns recovered in Mexico, the percentage of those that were long guns increased steadily from 20 percent in 2004 to 40

---

[10] *Id.* at 28.  When a firearm is recovered, a law enforcement official makes a "trace request" by entering specific identifying information (such as the firearm's serial number and model) into the ATF Firearms Tracing System, a database maintained by the ATF's National Tracing Center.  Although FOPA limits ATF's ability to keep and maintain firearms transactions records, the GCA permits ATF to maintain records of firearms transactions in certain circumstances.  For example, 18 U.S.C. § 923(g)(3)(A) requires FFLs to report two or more sales of a pistol or revolver to the same person during any five consecutive business days. ATF compares the identifying information entered with other firearm transaction records in the database, including multiple sales report information.  "If a trace request is matched to multiple sales information, the trace can be completed in minutes rather than days or weeks." OFFICE OF THE INSPECTOR GEN., *supra* note 6, at 10.  If the database contains no record information on the particular firearm, ATF must contact the manufacturer, importer, and/or wholesaler to identify the final purchaser—a process that can take up to ten days.

[11] U.S. GOV'T ACCOUNTABILITY OFFICE, *supra* note 7, at 28.

[12] *Id.*

[13] *Id.* at 59.

[14] OFFICE OF INSPECTOR GEN., *supra* note 6, at iv.

percent in 2008.[15]  In addition, the review noted that, since long guns generally have a shorter "time-to-crime"[16] than handguns, long guns generate more valuable leads for law enforcement officials,[17] and that "Mexican cartels are obtaining long guns in multiple sales."[18]  These and other findings led OIG to conclude that "the mandatory reporting of long gun multiple sales could help ATF identify, investigate, and refer for prosecution individuals who illegally traffic long guns into Mexico."[19]  Accordingly, OIG recommended that ATF "explore options for seeking a requirement for reporting multiple sales of long guns."[20] ATF responded that it would "explore the full range of options to seek information regarding multiple sales of long guns," but noted that some options could "require a change to the [GCA] which is beyond ATF's . . . authority."[21]

On December 17, 2010, ATF responded to these reports and recommendations by announcing a proposal that would require FFLs in Arizona, California, New Mexico, and Texas "to report multiple sales or other dispositions whenever the licensee sells or otherwise disposes of two or more rifles within any five business consecutive days with the following characteristics: (a) [s]emi-automatic; (b) a caliber greater than .22; and (c) the ability to accept a detachable magazine."[22]  After the initial sixty-day comment period, during

---

[15] *Id.* at 38.

[16] "Time-to-crime is the time from the retail sale of a firearm to the time it is recovered at a crime scene or is traced." *Blaustein*, 365 F.3d at 285.

[17] OFFICE OF INSPECTOR GEN., *supra* note 6, at 38.

[18] *Id.*

[19] *Id.* at 39–40.

[20] *Id.* at 40.

[21] *Id.* at 127.

[22] Agency Information Collection Activities: Proposed Collection; Comments Requested, 75 Fed. Reg. 79,021, 79,021 (Dec. 17, 2010).

which ATF received 12,680 comments (8,928 in support and 3,752 in opposition), ATF extended the comment period for an additional thirty days, clarifying that the requirement would only apply to FFLs "who are dealers and/or pawnbrokers in Arizona, California, New Mexico and Texas."[23]

ATF issued the challenged demand letter in July 2011 to FFLs who were dealers and/or pawnbrokers in Arizona, California, New Mexico, and Texas. 10 Ring Precision, Inc., located in Texas, received the demand letter and filed suit against Kenneth Melson, Acting Director of ATF,[24] arguing that ATF exceeded its authority in issuing the July 2011 demand letter and seeking declaratory as well as injunctive relief under the Administrative Procedure Act. Golden State Tactical, located in California, also received the demand letter and moved to intervene as a plaintiff in the case. The district court granted Golden State's motion over ATF's opposition. In response, ATF filed the administrative record and moved for summary judgment. 10 Ring filed a motion to exclude portions of the administrative record referencing trace results originating from Mexico, and, along with Golden State, also moved for summary judgment. The district court denied 10 Ring's motion to exclude portions of the record, denied the Plaintiffs' cross-motion for summary judgment, and granted summary judgment in favor of ATF. 10 Ring and Golden State (collectively "Appellants") timely appealed.

During the pendency of this appeal, the D.C. Circuit issued its opinion in *National Shooting Sports Foundation, Inc. v. Jones*, which upheld the validity of the July 2011 demand letter against challenges virtually identical to those

---

[23] Agency Information Collection Activities; Proposed Collection Comments Requested: Report on Multiple Sale or Other Disposition of Certain Rifles, 76 Fed. Reg. 24,058, 24,058 (Apr. 29, 2011).

[24] Kenneth Melson stepped down as Acting Director of ATF in September 2011, and, during the pendency of this suit in district court, was replaced by Todd Jones.

presented by Appellants.[25] As we explain below, we agree with that decision and join the D.C. Circuit in upholding the validity of the July 2011 demand letter.

## II.

"We review a district court's grant of summary judgment de novo, applying the same standard as the district court."[26] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[27]

## III.

Appellants first argue, based on various provisions of 18 U.S.C. § 923(g), as well as the Consolidated and Continuing Appropriations Act of 2010, that ATF lacked statutory authority to issue the July 2011 demand letter. "We review ATF's interpretation of the GCA under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*"[28] Under *Chevron*, we first ask "whether Congress has directly spoken to the precise question at issue."[29] If it has, "that is the end of the matter," and we "must give effect to the unambiguously expressed intent of Congress."[30] If it has not, we defer to the agency's interpretation as long as it "is based on a permissible construction of the statute."[31]

---

[25] 716 F.3d 200 (D.C. Cir. 2013).

[26] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 635 (5th Cir. 2011).

[27] FED. R. CIV. P. 56(a).

[28] *Nat'l Shooting Sports Found.*, 716 F.3d at 207 (internal citations omitted).

[29] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

[30] *Id.* at 842–43.

[31] *Id.* at 843.

## A.  Section 923(g)(5)(A)

Appellants first contend that ATF exceeded 18 U.S.C. § 923(g)(5)(A)'s limits on its demand letter authority.  Section 923(g)(5)(A) provides:

> Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, *all record information required to be kept by this chapter or such lesser record information* as the Attorney General in such letter may specify.[32]

Appellants argue that the July 2011 demand letter runs afoul of § 923(g)(5)(A) because it requires FFLs to report record information they are not otherwise required to keep.  But that is not the case.  18 U.S.C. § 923(g)(1)(A) provides that FFLs "shall maintain such records of . . . disposition of firearms at [their] place of business for such period, and in such form, as the Attorney General may by regulations prescribe."[33]  One such regulation—27 C.F.R. § 478.124(a)—provides that FFLs must record on Form 4473 any transaction in which they "sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee."[34]  Form 4473 requires the FFL to record the name, address, sex, race, date of birth, and place of birth of the buyer; the buyer's identification number, type of identification, and identification state; the date and location of the sale; and the manufacturer, importer, type, model, caliber, and serial number of the firearm.[35]  The July 2011 demand letter instructs its recipients to report to ATF using Form 3310.12.  Form 3310.12 requires FFLs to provide the name, address, sex, race, date of birth, and place of birth of the

---

[32] 18 U.S.C. § 923(g)(5)(A) (emphasis added).

[33] *Id.* § 923(g)(1)(A).

[34] 27 C.F.R. § 478.124(a).

[35] *See id.* § 478.124(c)(1), (4).

buyer; the buyer's identification number, type of identification, and identification state; the date and location of sale; and the manufacturer, importer, model, caliber, and serial number of the firearm. The July 2011 demand letter's reporting requirement complies with § 923(g)(5)(A) because FFLs are already required to maintain that record information under § 923(g)(1)(A) and its implementing regulations. Therefore, the text of § 923(g)(5)(A) "unambiguously authorizes the demand letter," and "our inquiry ends at *Chevron* step one."[36]

Appellants nonetheless urge that the July 2011 demand letter requires FFLs to report information beyond what they are required to keep because Form 4473 does not include information regarding the firearm's mechanism of action, the type of ammunition feeding source, or the number of days between sales of rifles to a single buyer. They point out that the demand letter instructs them to report "whenever, at one time or during any five consecutive business days, [they] sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person." But that argument "confuses the conditions precedent to submission with the information submitted."[37] If the FFL has "at one time or during any five consecutive business days, [sold] or otherwise dispose[d] of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 . . . to [the same] unlicensed person," then the FFL has a duty to submit the information requested on Form 3310.12. But Form 3310.12 does not require that the FFL *report* the rifle's mechanism of action, its type of ammunition feeding source, or the number of days between sales of rifles to a single buyer.

In a variation on the same argument, Appellants contend that the July 2011 demand letter runs afoul of § 923(g)(5)(A) because an FFL cannot

---

[36] *Nat'l Shooting Sports Found.*, 716 F.3d at 208.

[37] *Id.*

determine, using Form 4473, whether a particular rifle sale must be reported, because Form 4473 does not contain information regarding the rifle's type of action and ammunition feeding source. Assuming *arguendo* that inability to determine, based on "record information required to be kept," whether a particular sale must be reported could invalidate a demand letter, Appellants' assertion belies reality. As the D.C. Circuit explained in rejecting the same argument:

> [Appellants] fail[] to explain why an FFL cannot determine a rifle's type of action and ammunition feeding source using his record of the rifle's serial number, manufacturer and/or model name. To argue . . . that an FFL — who purchases and sells firearms for a living — would price and sell rifles without knowing its type of action and ammunition feeding source blinks reality. And even assuming an FFL could somehow not determine the characteristics of his own rifles, ATF provides a web site and telephone number that the FFL can use to obtain assistance in determining whether a rifle is "semi-automatic" and "capable of accepting a detachable magazine."[38]

In another iteration of the argument, Appellants point out that 27 C.F.R. § 478.124(b) permits FFLs to retain the Form 4473s in alphabetical, chronological, or numerical order,[39] and argue that, unless the FFL keeps the forms in chronological order, "Forms 4473 could not be used to determine whether a qualifying rifle had been sold to the same person within five (5) consecutive business days." But Appellants offer no reason why this purported administrative difficulty invalidates the July 2011 demand letter. The GCA requires an FFL who sells two or more pistols or revolvers to the same person at one time or during any five consecutive days to report to ATF.[40] Thus, prior to the July 2011 demand letter, FFLs were required to search their records for multiple sales of a particular type of firearm to the same customer. Moreover,

---

[38] *Id.* at 209.

[39] 27 C.F.R. § 478.124(b).

[40] 18 U.S.C. § 923(g)(3)(A).

"[t]he fact that an FFL chooses to keep his records in alphabetical or numerical order does not mean that the FFL can complain if his choice may not always be the least burdensome," especially given that "there is nothing preventing an FFL from maintaining records in a less burdensome (in this case, chronological) manner."[41]

## B. Sections 923(g)(1)(A), 923(g)(1)(B), 923(g)(3)(A), and 923(g)(7)

Appellants next argue that §§ 923(g)(1)(A), 923(g)(1)(B), 923(g)(3)(A), and 923(g)(7) must be read to limit ATF's demand letter authority, because otherwise "ATF could send a broad demand letter for information which otherwise must be obtained pursuant to the specific procedures, and for the specific reasons set forth, in these other provisions."[42]  We disagree.

Section 923(g)(1)(A) authorizes ATF to inspect a licensee's records and inventory if it has "reasonable cause to believe a violation . . . has occurred and that evidence thereof may be found on such premises."[43]  Prior to conducting an inspection under this section, ATF must secure a warrant from a magistrate judge.[44]  Section 923(g)(1)(B) provides an exception to the warrant requirement of § 923(g)(1)(A) by authorizing ATF to conduct an inspection of a licensee's records and inventory "without such reasonable cause or warrant . . . in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the [FFL]" or if "required for determining the

---

[41] *Nat'l Shooting Sports Found.*, 716 F.3d at 209.

[42] Appellants also argue that "[t]he legislative history reveals that Congress intended that § 923(g)(5)(A) was limited to information from FFLs (1) who were in violation of the law, and (2) about specific firearms dispositions necessary for bona fide criminal investigations." But we will not analyze legislative history because the GCA's text is clear.  *Nat'l Shooting Sports Found.*, 716 F.3d at 211–12; *see also Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *J & G Sales, Inc. v. Truscott,* 473 F.3d 1043, 1050 (9th Cir. 2007); *Blaustein & Reich, Inc.,* 365 F.3d at 288 n. 15.

[43] 18 U.S.C. § 923(g)(1)(A).

[44] *Id.*

disposition of one or more particular firearms in the course of a bona fide criminal investigation."[45] Appellants contend that upholding ATF's authority to issue the July 2011 demand letter would allow ATF to circumvent the requirements of §§ 923(g)(1)(A) and 923(g)(1)(B) because ATF could simply send a demand letter for a record without securing a warrant or establishing that the record relates to an ongoing criminal investigation. We are not persuaded. Appellants "erroneously conflate[] provisions that apply in two different contexts. The inspection provisions of 18 U.S.C. § 923(g)(1) and (B) apply to *entry onto* an FFL's premises. By contrast, section 923(g)(5)(A) simply authorizes ATF to require the FFL to submit information."[46] Given the distinct purposes of these provisions, we conclude that §§ 923(g)(1)(A) and 923(g)(1)(B) do not circumscribe ATF's demand letter authority.

Appellants next argue that § 923(g)(3)(A) demonstrates Congress's intent to limit ATF's ability to request reports of multiple sales to multiple sales of handguns. Section 923(g)(3)(A) requires all FFLs to "prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols or revolvers . . . to an unlicensed person."[47] Appellants argue that "[b]y including only 'pistols or revolvers' and not including 'firearms' in § 923(g)(3)(A), Congress expressed its intent to limit multiple sale reporting to pistols or revolvers." This argument also fails to persuade. Section 923(g)(3)(A) in no way purports to limit ATF's ability to issue a demand letter requiring reporting of multiple sales of other firearms. "Simply because the Congress

---

[45] 18 U.S.C. § 923(g)(1)(B)(i), (iii).

[46] *Nat'l Shooting Sports Found.*, 716 F.3d at 210 (emphasis in original). Other circuits have noted that §§ 923(g)(1)(A) and 923(g)(1)(B) serve distinct purposes from those served by ATF's demand letter authority. *See, e.g.*, *J & G Sales*, 473 F.3d at 1050; *RSM, Inc. v. Buckles*, 254 F.3d 61, 66 (4th Cir. 2001).

[47] 18 U.S.C. § 923(g)(3)(A).

imposes a duty in one circumstance does not mean that it has necessarily foreclosed the agency from imposing another duty in a different circumstance. . . . In [§] 923(g)(5)(A), the Congress authorized ATF to require additional reporting beyond the reporting required in [§] 923(g)(3)(A)."[48]

Finally, Appellants contend that § 923(g)(7) "explicitly defines and limits the purpose and procedure under which ATF may require information for traces." Section 923(g)(7) provides that licensees must "respond immediately to, and in no event later than 24 hours after the receipt of, a request by [ATF] for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms *in the course of a bona fide criminal investigation.*"[49] Appellants contend that ATF should not be able to use a demand letter to circumvent § 923(g)(7)'s requirement of a "bona fide criminal investigation." But § 923(g)(7) does not purport to restrict ATF's demand letter authority; it merely specifies the duties of an FFL that receives a trace request.[50] "Simply because some provisions of § 923 impose specific duties upon FFLs to respond to certain requests within a specified time frame and to provide record information sua sponte does not mean that the [ATF] is prohibited from seeking further FFL record information by demand letter."[51]

## C. Section 926(a)

Appellants next contend that the July 2011 demand letter runs afoul of § 926(a), which prohibits ATF from promulgating a "rule or regulation" that requires record information obtained from licensees to be "recorded at or

---

[48] *Nat'l Shooting Sports Found.*, 716 F.3d at 211.

[49] 18 U.S.C. § 923(g)(7) (emphasis added).

[50] Other circuits have reached the same conclusion regarding the interplay between §§ 923(g)(7) and 923(g)(5)(A). *See Nat'l Shooting Sports Found.*, 716 F.3d at 210–11; *J & G Sales*, 473 F.3d at 1050*; RSM*, 254 F.3d at 66.

[51] *J & G Sales*, 473 F.3d at 1050.

transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof" or that establishes a "system of registration of firearms, firearms owners, or firearms transactions or dispositions."[52] Appellants concede that the July 2011 demand letter is not a rule or regulation,[53] and thus falls outside the plain language of § 926(a)'s prohibition. But, they nonetheless maintain that the July 2011 demand letter runs afoul of congressional intent as evidenced by § 926(a)'s prohibition. They point to the Fourth Circuit's observation that "while [§] 926(a) does not directly prohibit [ATF's] issuance of the letter in this case, that provision clearly demonstrates Congress's concern about any attempt by [ATF] to establish a national firearms registry."[54] In evaluating the same argument, the D.C. Circuit concluded that "ATF's demand letter authority is not unlimited"—"Congress intended to prevent ATF from 'establish[ing] a national firearms registry' by 'issu[ing] limitless demand letters under [§] 923(g)(5)(A) in a backdoor effort to avoid [§] 926(a)'s protections for law-abiding firearms owners.'"[55] We agree. But, like the D.C. Circuit, we conclude that the July 2011 demand letter does not run afoul of § 926(a)'s prohibition. Although the demand letter was sent to more FFLs than the demand letters at issue in prior cases,[56] it seeks only to obtain a narrow subset of information relating to a specific set of transactions—the sale of two or more rifles of a specific type to the same person in a five day

---

[52] 18 U.S.C. § 926(a).

[53] *See Nat'l Shooting Sports Found.*, 716 F.3d at 212; *J & G Sales*, 437 F.3d at 1051; *RSM*, 254 F.3d at 66.

[54] *RSM*, 254 F.3d at 67.

[55] *Nat'l Shooting Sports Found.*, 716 F.3d at 212–13 (quoting *RSM*, 254 F.3d at 67) (alterations in original).

[56] *See, e.g., J & G Sales*, 473 F.3d at 1046 (demand letter sent to approximately 450 FFLs, constituting 0.6% of FFLs nationwide)*; Blaustein & Reich*, 365 F.3d at 283 (demand letter sent to approximately 450 FFLs, constituting 0.6% of FFLs nationwide); *RSM*, 254 F.3d at 63 (demand letter sent to approximately 41 FFLs, constituting 0.1% of nationwide FFLs).

period—from a specific set of FFLs—FFLs in four border states who are licensed dealers and pawnbrokers.[57]

### D.  Consolidated and Continuing Appropriations Act of 2012

The Consolidated and Continuing Appropriations Act of 2012 allocates funding to ATF.  An appropriations rider to the Act prohibits ATF from using the allocated funds "for salaries or administrative expenses in connection with consolidating or centralizing within the Department of Justice the records, or any portion thereof, of acquisition and disposition of firearms maintained by [FFLs]."[58]  Appellants argue that the July 2011 demand letter runs afoul of the rider because it requires recipients to transmit records of their dispositions of firearms to the National Tracing Center, which are, in turn, processed by ATF employees whose salaries are taken from the annual appropriations fund.

We conclude that the rider does not prohibit ATF from issuing the July 2011 demand letter.  Because FOPA clearly contemplates ATF's collection of some firearms records,[59] it cannot be said that the appropriations rider prohibits *any* collection of firearms transaction records.[60]  "The plain meaning of consolidating or centralizing does not prohibit the mere collection of some limited information. Both consolidating and centralizing connote a large-scale enterprise relating to a substantial amount of information."[61]  We conclude that

---

[57] *See Nat'l Shooting Sports Found.*, 716 F.3d at 214 ("[B]ecause ATF sent the demand letter to only seven percent of FFLs nationwide and required information on only a small number of transactions, the July 2011 demand letter does not come close to creating a 'nationwide firearms registry.'").

[58] Pub. L. No. 112-55, 125 Stat. 552, 609 (2011).

[59] *See* 18 U.S.C. § 923(g)(3), (4).

[60] *See Colautti v. Franklin,* 439 U.S. 379, 392 (1979) (explaining that it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative").

[61] *Blaustein*, 365 F.3d at 289.

the July 2011 demand letter falls short of "consolidating or centralizing . . . records." It only requires reporting of a narrow subset of information relating to a specific set of transactions—the sale of two or more rifles of a specific type to the same person in a five day period—from a specific set of FFLs—FFLs in four border states that are licensed dealers and pawnbrokers.[62]

## IV.

Alternatively, Appellants argue that, even if ATF had statutory authority to issue the July 2011 demand letter, its decision to do so was arbitrary and capricious. We will set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[63] Review under that standard is "narrow" and we must be mindful "not to substitute [our] judgment for that of the agency."[64] However, we must also ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."[65] We "consider whether the decision was based on a consideration of relevant factors and whether there was a clear error of

---

[62] Demand letters upheld previously have required reporting of a broader set of transactions. For example, in *RSM, Inc. v. Buckles*, ATF required the targeted FFLs to produce record information regarding firearm purchases and sales in the prior three years. 254 F.3d at 63. And, in *Blaustein & Reich, Inc. v. Buckles*, ATF required the targeted FFLs to submit record information relating to their purchases of secondhand firearms in 1999. 365 F.3d at 283. Admittedly, the demand letters at issue in those cases were sent to far fewer FFLs than the July 2011 demand letter.

[63] 5 U.S.C. § 706(2)(A).

[64] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[65] *Id.*

judgment."[66] We will uphold an agency's action "if its reasons and policy choices satisfy minimum standards of rationality."[67]

Appellants allege that ATF's issuance of the July 2011 demand letter was arbitrary and capricious for two reasons. First, because "[t]he tracing system queries demonstrated that the overwhelming majority of retail sellers in the United States and, more specifically, in the Border States, had not sold a single rifle that was later recovered in Mexico," Appellants argue that ATF improperly determined which FFLs to target. Second, Appellants argue that ATF neglected to consider alternatives to sending the demand letter to FFLs in the four border states. Neither of these arguments survives the "highly deferential arbitrary and capricious standard of judicial review."[68]

Appellants' first argument fails because, given the data that ATF identified as supporting its decision, Appellants cannot convincingly argue that there is no "rational connection" between the facts in the administrative record and the FFLs targeted by the June 2011 demand letter.[69] As explained in the GAO Report, "[f]rom fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states. In particular, about 70 percent of these firearms came from Texas, California, and Arizona."[70] Moreover, according to ATF trace data, from fiscal year 2008 through fiscal year 2010, of the 5,799 rifles greater than .22 caliber that were

---

[66] *Id.* (internal quotations omitted).

[67] *Medina Cnty. Envt'l. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) (internal quotations omitted).

[68] *Abbeville Gen. Hosp. v. Ramsey*, 3 F.3d 797, 801 (5th Cir. 1993) (quotation marks omitted).

[69] *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[70] U.S. GOV'T ACCOUNTABILITY OFFICE, *supra* note 8, at 19.

traced from Mexico to an identified first retail purchaser in the United States, 4,568 were traced to retailers in Arizona, California, New Mexico, and Texas.

Appellants' second argument—that ATF's decision to issue the July 2011 demand letter was arbitrary and capricious because it failed to consider other feasible alternatives—is also unpersuasive. Appellants argue that ATF should have considered feasible alternatives "such as actual geographic proximity of retail sellers to the border with Mexico, known patterns of illegal firearms trafficking in Mexico, and specifically identified retail sources of rifles recovered in Mexico over the previous three years." Because "[s]ales of rifles recovered in Mexico were heavily concentrated among relatively few specifically identified retail sellers," Appellants suggest that ATF should have used trace data "to determine how many rifles each retail seller sold and how soon after the sales the rifles were recovered by law enforcement authorities in Mexico" and tailored the July 2011 demand letter accordingly. This argument misunderstands the scope of an agency's duty to consider alternatives. In deciding a course of action, agencies are not required to consider all potential alternatives.[71] "While an agency must consider and explain its rejection of 'reasonably obvious alternative[s],' it need not consider every alternative proposed nor respond to every comment made. Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives."[72] The alternatives posed by Appellants do not meet these criteria. For one, Appellants have not shown that these alternatives were a serious issue raised by any commenter.[73] Appellants try to argue that

---

[71] *See Motor Vehicle Mfrs.*, 463 U.S. at 51 ("[W]e [do not] broadly require an agency to consider all policy alternatives in reaching decision.").

[72] *Nat'l Shooting Sports Found.*, 716 F.3d at 215 (internal citations omitted).

[73] In fact, Appellants fail to point to any comments in the administrative record raising these alternatives. Appellants do point to an August 2009 pamphlet authored by "Mayors Against Illegal Guns," which includes a recommendation that ATF issue a demand letter requiring dealers "to report multiple sales of suspect long guns if in the prior year they had 15 or more traces or three or more traces of suspect long guns." MAYORS AGAINST ILLEGAL

these alternatives should have been "obvious" to ATF given the data in the administrative record. But the cases Appellants cite in support of that contention involve either alternatives raised during the comment period or an agency rescinding a policy or reversing course without providing explanation as to why it did not adopt narrower alternatives. In short, "the fact that ATF could have narrowed the scope of the demand letter does not mean that its failure to do so was arbitrary and capricious, particularly because [Appellants have] failed to point to any evidence showing that narrowing the geographic scope of the demand letter was a serious issue raised by any commenter."[74] We therefore conclude that "ATF's decision to direct its July 2011 demand letter to FFLs based on their geographic location was . . . not arbitrary and capricious."[75]

## V.

Before concluding, we pause to consider whether the district court should have excluded portions of the administrative record referencing the results of Mexican traces. 10 Ring argues that trace data should have been excluded because the funding, development, and implementation of ATF's system of tracing firearms recovered in Mexico are contrary to law and the intentions of Congress. Specifically, 10 Ring contends that § 923(g)(7) only permits trace requests that are made in the course of a *domestic* bona fide criminal investigation. But § 923(g)(7)'s plain language merely requires that the trace request be made "in the course of a bona fide criminal investigation."[76] And,

GUNS, A BLUEPRINT FOR FEDERAL ACTION ON ILLEGAL GUNS 31 (2009). But that pamphlet did not address the proposed demand letter, nor did Mayors Against Illegal Guns suggest that alternative in its comment to the July 2011 demand letter proposal.

[74] *Nat'l Shooting Sports Found.*, 716 F.3d at 217.

[75] *Id.*

[76] 18 U.S.C. § 923(g)(7). Nor does the presumption that Congress intended its statutes to have domestic, not extraterritorial, application mean that the Mexican traces were

19

Congress has recognized that ATF conducts trace requests by law enforcement officials in other nations.[77]   10 Ring also argues that the Privacy Act bars disclosure of purchaser information to Mexican authorities.  But the Privacy Act is inapplicable to use of the Firearms Tracing System.   The Privacy Act stipulates the conditions upon which an agency may disclose "any record which is contained in a system of records."  5 U.S.C. § 552a defines "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular *assigned to the individual*."[78] The Firearms Tracing System is not a "system of records," because traces are conducted by entering an identifying characteristic of the *firearm*, not the individual, into ATF's database.[79]

Because Appellants have not offered any authority indicating that the Mexican trace results should have been excluded, we conclude that the district court permissibly denied 10 Ring's motion to exclude portions of the administrative record.

---

conducted unlawfully.  The presumption against extraterritoriality has no bearing here because the Mexican government conducting traces using ATF's database is simply not an "extraterritorial application" of the GCA.

[77] *See, e.g.*, S. REP. NO. 112-158, at 63 (2012); H. Rep. No. 108-576, at 29 (2004).

[78] 5 U.S.C. § 552a(a)(5) (emphasis added).

[79] 10 Ring also argues that funding of the Mexican traces was unlawful because the administrative record does not contain documents establishing that the funding of ATF's eTrace 4.0 system "complied with [31 U.S.C.] § 9703(g)(4)(C)."  In the absence of clear and convincing evidence to the contrary, "[a] presumption of regularity attaches to the actions of Government agencies."  *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).  10 Ring has offered no evidence to rebut that presumption.  It attempts to argue that the presumption of regularity does not apply because there is no evidence that the Director took any action to comply with § 9703(g)(4)(C), but it cites no cases indicating that the presumption of regularity does not apply to purported agency inaction.

No. 12-50742

## VI.

The judgment of the district court is AFFIRMED.